Pat CANTERINO, et al., Plaintiffs,

and

United States of America, Plaintiff Intervenor,

v.

George W. WILSON, et al., Defendants.

Civ. A. No. 80–0545–L.

United States District Court,
W. D. Kentucky,
Louisville Division.

July 26, 1982.

Susan Deller Ross, Charles Ory, Terisa. Chaw, U. S. Justice Dept., Civ. Rights Div., Sp. Litigation Section, Washington, D. C., for plaintiff-intervenor.

Walker Bledsoe Smith, David A. Friedman, Anne Marie Regan, Legal Aid Soc., Inc., Leslie W. Abramson, Louisville, Ky., Claudia T. Wright, ACLU National Prison Project, Washington, D. C., for plaintiffs.

Barbara W. Jones, Gen. Counsel, Linda G. Cooper, Corrections Cabinet, J. Gary Bale, Dept. of Education, Frankfort, Ky., for defendants.

## MEMORANDUM OPINION

JOHNSTONE, District Judge.

This action is before the Court for judgment following a four week trial, submission of post-trial briefs and oral arguments. Plaintiffs are inmates at the Kentucky Correctional Institution for Women (KCIW). They seek a broad range of relief concerning the conditions of their confinement, disparate treatment of men and women inmates in Kentucky's prisons, and the denial of opportunities for vocational training and education. This action was filed on October 31, 1980 and a class was certified on December 22, 1980 pursuant to Rule 23(a), (b)(1) and (b)(2) of the Federal Rules of Civil Procedure for purposes of declaratory and injunctive relief. Defendants are officials of the Kentucky Department of Corrections with responsibility for operating KCIW.

Plaintiffs' complaint was amended for the second time by motion. made December 23, 1981 and sustained February 22, 1982. The second amended complaint joined the Superintendent of Public Instruction as a defendant, alleging the Department of Education operates vocational education programs for the Department of Corrections in a manner which discriminates against women in violation of Title IX of the Education Amendments of 1972 and Title II of the Vocational Education Amendments of 1976. The Court severed the claims against the Department of Education on April 6, 1982, pending trial of the claims against the Department of Corrections.

The United States Department of Justice filed a complaint in intervention on March 11, 1982, alleging discrimination against female inmates in the Kentucky prison system in violation of the equal protection clause of the fourteenth amendment and 20 U.S.C. § 1681.[1] This action is properly maintained as a class action and jurisdiction is proper under 28 U.S.C. §§ 1341, 1343, 1345 and 42 U.S.C. § 2000h–2. Venue is proper under 28 U.S.C. §§ 1391 and 1392.

KCIW is a multi-custody prison located on a compound of 276 acres, seven of which are fenced and contain the main institutional buildings. One building, opened in 1938, contains the dormitories, cafeteria, kitchen, infirmary, academic school, institutional offices, admissions and orientation unit, canteen, laundry, special management unit (cellblock), and law library (PX 55, DX 8).

---

1. The U. S., in its pre-trial statement filed with the Court and served on all counsel on the opening day of the trial, additionally alleged violation of the anti-discrimination clauses of the Comprehensive Employment and Training Act (CETA), as amended, 29 U.S.C. § 834(a) and (c), and the Omnibus Crime Control and Safe Streets Act of 1968, as amended, which created the Law Enforcement Assistance Agency (LEAA), 42 U.S.C. §§ 3789d(c)(1) and (3). Evidence of violations of the CETA and LEAA statutes first arose after the filing of the complaint, during discovery. These issues were fully presented during the trial and are properly before the Court under Rule 15(b), F.R.C.P.

An annex to this building, constructed more recently, houses the vocational education program. In addition to the main building, KCIW has an honor cottage, a chapel, a recreation building called the "Barn", and a minimum security unit known as "staff house."

The institution was designed to house a maximum of 110 inmates. Its population reached a modern high of 145 in 1976, at which time the state opened a new minimum security institution in northern Kentucky for women to relieve overcrowding at KCIW. That minimum security facility, the Daniel Boone Career Development Center (DBCDC), which usually housed around thirty women, (DX 22, p. 5), was closed in September, 1981 for budgetary reasons.[2] The prisoners at DBCDC were all transferred back to KCIW. Thus KCIW houses all minimum, medium and maximum security female offenders in Kentucky.

Most inmates at KCIW (63%) are between 18 and 30 years old. The median education level is tenth grade. About two-thirds of the inmates come from broken homes and almost three-quarters were responsible for at least one dependent child before incarceration. All but a handful were the sole or primary support for at least one dependent. A large majority (74%) of KCIW inmates were being incarcerated for the first time. Property crimes of theft, fraud and forgery comprise nearly half of all convictions. Murder and manslaughter are the next most frequent crimes, followed by drug related offenses. (See Peachee, "A Description of Female Offenders at KCIW," PX 5).

KCIW has operated since 1977 under a Levels System in which all institutional privileges are allocated on the basis of behavior and seniority. This system is all encompassing and is at the heart of plaintiffs' allegations of sex-based disparities in conditions of confinement.

The Court has divided the case into three main parts: the Levels System, vocational education and training, and general conditions of confinement. Issues concerning the classification procedures used at KCIW overlap into each of these areas, but some aspects of the classification system will be addressed separately.

Although the findings and conclusions which follow dictate that substantial changes must be made at KCIW, this should not be taken as an adverse reflection on Superintendent Kassulke, Associate Superintendent Chandler or the other highly committed staff people at the institution. Officials at KCIW, contrary to the case in so many conditions of confinement lawsuits, have exhibited great dedication to their jobs and genuine concern for the welfare of the inmates in their charge. The Court respects the efforts of these officials in a difficult job.

## I FINDINGS OF FACT

### A. THE LEVELS SYSTEM

#### 1. *History and Purpose*

The Levels System is a behavior modification program which regulates virtually every dimension of each inmate's life at KCIW. It controls visitation, phone calls, receipt of packages, bedtime, personal belongings, clothing, cosmetics, television viewing, recreation, bedding, and many other facets of daily existence. (*See* Plaintiffs' Exhibit # 122, Incentive Levels, 5th revision).

Each prisoner, upon admission to KCIW, is placed on Level 1, the status of all new inmates and inmates "who have normal privileges restricted." (PX 122, p. 5). Level 1 inmates are restricted to two one hour visits per week, and one five minute telephone call per month. They are denied access to the lounge and must be at their beds by 9:00 PM and in bed by 9:30. They cannot wear their own clothes, possess a hairdryer, display pictures of loved ones, or decorate their living areas. (PX 122).

---

**2.** The staff house, a building outside the fence, but on the compound at KCIW, was converted to a minimum security unit, along with another small house (the "cottage") on the KCIW grounds, upon the closing of Boone. *See* DX 8.

These restrictions on normal privileges are gradually lifted as an inmate progresses through the system.

A minimum amount of time must be spent on each level before promotion. The inmate must complete at least 30 days on Level 1, 60 days on Level 2, and 120 days each for Levels 3 and 4. There is a monthly review for all Level 5 inmates. Many inmates, solely because they are admitted after the third day of the month, when the Levels Committee meets, must spend up to 59 or 60 days on Level 1. (Testimony of Elizabeth Chandler, Assoc. Supt.). The average length of incarceration at KCIW is between eleven and thirteen months (DX 7). Most inmates, therefore, are not at the institution long enough to go beyond Level 3. (Chandler Testimony). Indeed, eighty (80) of the one hundred thirty (130) women who live in the main building were on Levels 1 and 2 at the time of the trial. (PX 2).

Inmates, to advance in the system, must avoid disciplinary infractions and meet certain minimum levels of performance in designated areas for which the correctional staff evaluates each prisoner. The areas of evaluation are work assignment, program participation, house cleaning[3] and "4 to 12" (conduct during free time). (PX 135). The evaluations are based on the subjective judgment of the staff, but testimony established that in over 99% of all cases, the evaluations yield a score high enough to ensure promotion (Testimony of Elizabeth Chandler, Assoc. Supt.). As a practical matter, therefore, the evaluations are *pro forma* and one's ability to progress through the system is dependent on a single, overriding factor: the ability to avoid disciplinary write-ups. (*See* plaintiff's cross-examination of Elizabeth Chandler, May 10, 1982).

The stated goal of the Levels System is "to promote personal growth, a positive attitude and socially acceptable behavior." (PX 122). The Court finds that the system in actual operation, however, "probably does just the opposite," as Shirley Goins,

plaintiffs' expert in corrections and the female offender, testified. Though the system purports to emphasize "positive reinforcements rather than punishment as a means of controlling behavior" (PX 122), in reality "it is primarily a punishment oriented system." (Testimony of Dr. Michael Nietzel, plaintiffs' expert in behavior modification). Dr. Michael Milan, professor of community psychology at Georgia State University, testified that, contrary to its stated goal, the system operates as if "intentionally designed to cause psychological and emotional damage." To understand why, the evolution of the system must be examined.

KCIW began to receive a new type of offender in the early 1970s. The staff, for the first time, was confronted with a group of inmates who were institutionally sophisticated, disruptive, and potentially dangerous. This posed special problems at KCIW, a small institution with open dormitory style living areas which housed all categories of offenders, from a wide variety of backgrounds. (Testimony of Betty Kassulke, Supt.). A series of incidents from 1972 to 1976 convinced Superintendent Kassulke that the institution "was out of control."

The monthly incident reports from the periods in question, (PX 181–83), show that this reaction was probably exaggerated. There were no assaults on guards, no riots, no stabbings, and a number of violent incidents which was not disproportionally high. There is no question, however, that a small number of inmates in this period presented a serious behavior problem. According to Superintendent Kassulke, the number of prisoners who caused most of the disruption was never more than six to eight.

The composition of the inmate population has changed dramatically since the period from 1972 to 1976 when this disruption was a problem. In 1977 when the Levels System was first imposed and shortly after the institution was characterized as being "out of control," over 50% of the population had

---

**3.** It is unclear whether this area is still included in the evaluations. *See* Chandler Deposition, 11–13–81, p. 20, *C.f.* Kassulke Deposition, 1–18–82, pp. 119–20.

served time before. (PX 5). Yet, even during that period, only a handful of inmates caused most of the disruption. In contrast, by 1980, 74% of the KCIW population was incarcerated for the first time. The lack of institutional sophistication in the more recent period is illustrated in Table 8 of PX 5. For example, in 1980, *all* of the inmates serving time for serious crimes such as arson, robbery and assault, were being incarcerated for the first time. Over 90% of KCIW drug offenders in 1980 had no prior incarcerations. KCIW has thus developed the most harsh system of allocating privileges in the entire Kentucky penal system in order to deal with problems posed by institutionally sophisticated inmates, during a period when defendants' own research shows KCIW has become predominately an institution for first offenders.

There was no modern, objective system of classification in effect at KCIW during this early period of institutional turmoil. Inmates were not evaluated for purposes of security, custody and treatment on the basis of standard criteria for determining their ability and willingness to adjust to prison life. Thus the street-wise and the unsophisticated were indiscriminately mixed. The resulting problems of institutional management were addressed not through isolation of the few troublemakers or adoption of a modern, objective classification system, but rather through imposition on the entire population of a mandatory system of behavior modification.

The Levels System was voluntary at its inception, but soon participation became required. It was designed by staff members with no training in behavior modification. It has never been tested for validity or reliability. Prior to this lawsuit, it had never been evaluated by a psychologist or psychiatrist professionally qualified to judge its effect on the prisoners. (*See* Kassulke Deposition, January 18, 1982, pp. 79–107).

None of the prisons in which men are incarcerated have a levels system that is comparable to the one at KCIW in scope or application. Neither Kentucky State Reformatory (KSR), the medium security male prison, nor Kentucky State Penitentiary (KSP), the maximum security institution for males, has a levels system. (Rees and Parke Testimony). Blackburn Correctional Complex, a minimum security institution for males, has the most highly developed levels system for males. The system at Blackburn is used to award only a few special privileges such as off-the-complex recreation and furloughs. (Kavanaugh Testimony). The system at Blackburn has no application to such daily activities as bed time, phone calls, access to dayrooms, decoration of living areas, wearing of personal clothes, visitation, use of cosmetics or jewelry, participation in group activities and other areas governed by the Levels System at KCIW. In other words, no male inmate is subjected to a system which restricts the exercise of "normal" privileges. (*See* PX 122, p. 5). In this context, the Court's definition of a "normal" privilege is any privilege which can be regularly exercised by all inmates without compromising any valid purpose of the institution (*e.g.*, security and safety). This definition thus includes all privileges routinely accorded male inmates in Kentucky's male prisons.

### 2. Impact on Classification

The Levels System served as the only classification system at KCIW from its initial adoption in May, 1977 until April, 1981, some six months after the filing of this lawsuit. At that time the Bureau of Corrections adopted a system wide classification program as a result of class action suits over conditions of confinement in the men's maximum and medium security institutions (*Kendrick v. Bland*, W.D.Ky., 541 F.Supp. 21, and *Thompson v. Bland*, C.A. 79–0092–P, W.D.Ky.). Thus, until recently even the most non-violent first offender was classified as a maximum security prisoner while she was on Level 1, and the same non-violent first offender would not be eligible for minimum security status until reaching Level 4 (*See* PX 144, Incentive Levels, 4th revision).

The classification process was, in theory, split from the Levels System in April, 1981 (Defendants' Exhibit 3). The Levels System in practice, however, is still hopelessly intertwined with classification. The Court agrees with the assessment of Dr. Brad Fisher, primary author of the National Institute of Corrections' Model Classification System, the system upon which Kentucky's new classification process is based. Dr. Fisher found that the Levels System "totally confuses" the classification process. For example, a basic classification decision is eligibility for furloughs. According to PX 122 and the Resident-Staff Handbook (PX 55, pp. 37–38) even an undoubted minimum security prisoner (e.g., a first offender with no history of violence, drug abuse or other objective problems) is ineligible for a furlough until she reaches Level 3.[4] Disciplinary reports over non-violent, minor offenses (e.g., talking too loud) can result in the loss of meritorious good time and other punishments under the Levels System, which interfere with custodial decisions that should be made on the basis of security risk assessment and objective criteria. (See e.g., PX 137).

Proper classification brings objectivity and certainty to the penal system. Through the classification process, inmates are told what society expects from them to earn the right to re-enter the community. Each inmate is given a timetable for progression through the penal system. See IMD 721.02. (Corrections Cabinet Internal Management Directives, Joint Exhibit 8). This classification system, however, is virtually superfluous to female inmates at KCIW due to the superimposition of the Levels System over so many facets of daily existence.

The Levels System is a complicated program which rigidly governs such elementary decisions as when to go to bed and even the ability of a mother to display a picture of her child. It is not surprising, then, that female inmates are vitally concerned with

their level, and generally unaware of their classification. (See e.g., Testimony of Patty Lettelier).

The Court finds that this institutional preoccupation with the Levels System renders the classification system impotent to meet its goal of treating each inmate objectively in an effort to achieve re-integration into society. Although Steven Kaiser, Director of Classification for the Department, testified that he saw no conflict between the Levels System and the classification program, the Court is persuaded by the testimony of Dr. Fisher, Mr. Sielaff, and Ms. Goins that the Levels System overlaps with and conflicts with classification. As Dr. Fisher testified, the classification system at KCIW "isn't getting out of the starting blocks" due to the Levels System, which operates in a subjective and unpredictable manner. The Court finds that the objective classification program recently adopted by the Department, to benefit all inmates, is ineffective for female inmates because the Levels System preoccupies the interest of both inmates and staff at KCIW.

### 3. Operation of the System: Punitive Restrictions, Sex-based Disparities and Correctional Goals

The Levels System is confusing to inmates because a single disciplinary write-up can affect a prisoner in several different ways. It has one effect in terms of punishment (e.g., segregation, extra duty, loss of good time), another in terms of levels (loss of privileges), and still another in terms of classification (e.g., eligibility for community programs). (See Testimony of Dr. Fisher). This confusion is exacerbated by the constant changes which occur in the rules governing Levels System.

The operative document governing implementation of the Levels System is PX 122, the fifth formal revision of the program in its five years of operation. According to

4. Testimony of prison officials, compared with PX 122 and the Resident-Staff Handbook, PX 55 at pp. 37–38, shows there is some confusion as to the rules on furlough eligibility. This

illustrates another problem of the Levels System which will be discussed below. See § 1(A)(3), infra.

PX 122, Level 3 inmates are ineligible for furloughs, Level 2 inmates are ineligible for any trips, only Level 4 and 5 inmates are eligible to live in staff house (the minimum security unit), a prisoner cannot receive meritorious good time until she reaches Level 4, all extra duty must be complete before promotion to a new level, and eligibility for incentive visits begins at Level 4. Yet all these policies changed in the six months since PX 122 went into effect in November, 1981. (See Testimony of Elizabeth Chandler, Assoc. Supt., and Christine Loving, Director of Admissions and Orientation). None of these changes have ever been put in writing, nor has the general population ever been informed of them.

Lack of certainty about what the rules are undermines any positive effect of this form of behavior modification system. The experts all agreed on one point: Certainty about expectations is a vital element of behavior modification. The expectations and rules of the Levels System are hopelessly muddled, confusing and constantly changing. The uncertainty and subjectivity which pervade the system thus undermine the values the system was intended to promote.

This problem is intensified by the nature of the "privileges" which are parceled out by progression through the system. Most of these "privileges" are things which are available as a matter of course, and in some instances as a matter of right, at all male institutions in the Kentucky penal system. (See Plaintiffs' cross-examination of Wardens Al Parke, John Rees, William Seabold, Paul Kavanaugh, and Michael O'Dea and Testimony of Inmate Mike Bolton). For instance, over fifty per cent of the women inmates at KCIW are not allowed to display pictures of family and loved ones because they are below Level 3. The thirty inmates on Level 1 must be at their bed by 9:00 P.M. and in bed by 9:30; they must wear a drab, shapeless "state dress" that even prison administrators concede is "demeaning." (Kassulke and Chandler Testimony). The use of dormitory dayrooms is governed by

levels, and only those women (less than half the population) on Level 3 or above may use the dayroom until the usual 11:00 P.M. closing time. None of these restrictions are imposed on male inmates.[5]

All male inmates have virtually unrestricted access to phone calls during free time; at KCIW most women inmates are allowed no more than 15 minutes per month for phone calls. A male prisoner in *disciplinary segregation* at KSP, the male maximum security institution, is allowed more visitation than a model female prisoner at KCIW on Level 2. All male general population inmates have at least twice as much visitation as a Level 5 female inmate at KCIW. As defendants' own document puts it, the Levels System entails substantial restrictions on "normal privileges." (PX 122, p. 5).

Though rehabilitation is "a primary thrust" of the Levels System (Chandler Testimony), there is little doubt that the system is counter-rehabilitative. As Allyn R. Sielaff, former chief corrections official in Wisconsin, Illinois and Pennsylvania, testified, the Levels System teaches the women to be docile and childlike rather than preparing them to return to society. Shirley Goins, a former corrections administrator in Illinois who has worked extensively with female offenders, convincingly explained how an inmate can be completely successful in the Levels System (achieving and maintaining Level 5) without developing any skills needed for reintegration into society. The system instead creates a virtual caste system which promotes negative manipulation, fosters jealousy and produces anxiety, tension and frustration. (Goins Testimony; see also Nietzel, Milan and Baxter Testimony). This problem is intensified since women on Level 5 live side by side Level 1 and 2 women in crowded open dormitories.

The system is fundamentally punitive in nature. This becomes evident when its individual components are examined. The testimony established that even the correctional staff who designed the system could

5. This discussion of disparities in normal privileges is illustrative and not exhaustive.

not explain the penological justification for its components. By way of illustration, no correctional justification could be given for restricting new inmates to one five minute phone call per month, requiring new inmates to get staff approval before attending religious services other than on Sunday, restrictions on visitation, prohibiting women below Level 3 from displaying pictures, or requiring Level 3 status for possession of blow-dryers or electric razors. (*See* Testimony of Christine Loving, Director of Admissions & Orientation).

The hierarchy of restrictions on visitation and phone calls is particularly noteworthy. As John Rees, Superintendent of Kentucky State Reformatory, testified, visits and phone calls are "the most important things an inmate can have." Superintendent Rees explained how increased phone calls and visitation were now generally accepted in the correctional field and how this change in philosophy has benefited the institutions by reducing tension and anxiety among prisoners.

Shirley Goins explained why phone calls and visits were most important in the initial period of incarceration and how they enhance both security and reintegration skills. Yet the Levels System restricts phone calls and visits most severely in the initial period and denies female inmates at KCIW the benefits described by Superintendent Rees and Ms. Goins. The Levels System restrictions on visitation, moreover, are in direct conflict with IMD 403.04, which states in part "[v]isiting limitations and restrictive length of visits will be only to avoid overcrowding." (Joint Exhibit 8).

Although the Director of Admissions & Orientation testified that requiring Level 1 inmates to wear "state dresses" was her idea, she was unable to articulate any purpose for this requirement. Associate Superintendent Chandler testified that the state dress requirement was a "form of hazing." The Court is persuaded by the evidence that the same can be said of most of the restrictions of the Levels System.

The lack of correctional justification for these measures renders the system punitive and artificial. Because mediocre performance is rewarded equally with outstanding performance and because so many basic aspects of daily life are arbitrarily labeled "privileges", the system breeds disrespect for authority and fosters a "malicious compliance" which undermines the relational skills needed for rehabilitation. (Goins Testimony).

As previously discussed, the system·was originally implemented to deal with problems of institutional control and security caused by a small number of incorrigible inmates. The imposition of the Levels System on the entire population in order to deal with problems attributable to only a few individuals proved to be an exaggerated response, which has been counter-productive in terms of the behavior of the average inmate. The system became mandatory in October, 1977. The number of incident reports per inmate averaged between two and three per year from 1974–78. In the next two years, there was a steady and dramatic increase to an average of over six incident reports per year per inmate in 1980.[6] (PX 152). Thus, the system has had the opposite of its intended effect as a mechanism for managing the institution.

The sharp rise in incident reports corresponds precisely to the period when the population was dramatically changing from institutionally sophisticated to very unsophisticated.[7] This indicates to the Court that the system has had no effect on the behavior of hardened career criminals who are adept at manipulating the system. Those incarcerated for the first time, on the other hand, have difficulty adapting to this arbitrary system of allocation of privileges

---

**6.** Sometime during 1980, defendants changed their method of reporting incidents, making it difficult to compare statistics before and after the change. But a dramatic increase in write-ups clearly began after initiation of the Levels System and before the change in reporting methods.

**7.** *See* discussion of information accompanying Table 8 of PX 5, § 1(A), *supra.*

and have responded with behavior that has resulted in the dramatic increase in write-ups. This conclusion is bolstered by the fact that the sharp increase in write-ups occurred almost exclusively in non-violent incidents (PX 154), the type of incidents in which first offenders are most frequently involved (Table 9, PX 5).

The prison officials who testified did not seek to justify the system on security grounds. Indeed, the Director of Admissions & Orientation, who helped design the system and teaches it to all new inmates, expressly testified that the system was *not* a security measure.

This comports with the evaluation of Professor Sielaff, who, based on his experience as a corrections administrator in three states, testified that the system serves no security purpose. (*See also* Goins Testimony). In view of the lack of correctional purpose for the individual elements of the Levels System, the absence of an over-all security related purpose, and the adverse impact on rehabilitation and the classification process, the Court must conclude that the Levels System is primarily a punitive system of behavior modification.

### 4. *Adverse Impact on Plaintiff Class*

Dr. Michael Nietzel, professor of psychology at the University of Kentucky and a specialist in behavior modification theory, explained how a punitive behavior modification system produces the following side effects: 1) fear and tension anxiety (resulting in sleep disturbance and depression); 2) learned helplessness (apathy, loss of will to change); 3) aggression (anger, jealousy, friction); and 4) underground behavior (complying with rules while authorities are present, then undermining the system when unobserved). The testimony of the inmates presented credible evidence that these side effects are indeed experienced by prisoners at KCIW.

Dr. Nietzel also noted another factor which the Court finds significant: on virtually every other aspect of life at KCIW there was a marked difference of opinion among inmates. Many inmates testified that various programs or jobs or staff members were good. But there was a unanimous and deeply felt belief that the Levels System is oppressive and unfair.

The Court finds that this system of artificial punishment and rewards, in which inmates become the objects of an institutional stimulus/response experiment, blocks reintegration into society by requiring dependence on the system for many basic elements of self-identity. The artificial "rewards" of the institution become the focus of existence. Thus, as Dr. Baxter, a University of Texas psychiatrist and expert in systems behavior, testified, the system tends to demoralize the inmates, producing depression and childlike responses.

The impact of the system on the mental and emotional state of the inmates is evidenced by the fact that, at any given time, from one-third to one-half of the population at KCIW is under prescription for some form of mood-altering medication. (Defendants' Exhibit 116, Testimony of Dr. Milan, Dr. Starrett). The widespread prescription of psychotropic drugs is a tangible indicator of the effect of the Levels System.

Neither plaintiffs nor defendants contend that these drugs are being improperly or over-prescribed. Yet, as Dr. Milan testified, it is unusual for more than 10–15% of the population to be under this kind of medication in similar penal institutions, even when the physical conditions are inferior to those at KCIW. Indeed, a report prepared by defendants' own research department shows that 60% of the women at KCIW were "in the high range of the stress scale." (PX 6). Thus, the Court concludes that the high level of stress and widespread need for psychotropic drugs reflects problems unique to this institution and the behavior modification system under which it operates.

The Court is convinced by the testimony of Doctors Baxter, Milan and Nietzel and the testimony of the inmates themselves, that the system is poorly designed, punitive and has unhealthy side effects. But whether the harm inflicted by the Levels System

results in measurable and lasting psychological injury is a question that this Court simply cannot answer. There are too many human variables, not susceptible to precise measurement, involved for the Court to make a factual finding on this important question. As Dr. Robert Granacher, defendants' psychiatric consultant, pointed out, there are a host of factors which contribute to the mental and emotional health of each individual inmate. Many of these factors are unrelated to conditions of confinement, and are rooted in experiences dating back to early childhood.

Dr. Granacher noted that the fact of incarceration is stressful to begin with. According to Dr. Granacher, the adverse consequences of the system's potential for creating stress and teaching learned helplessness are avoided because the system has an "escape" mechanism: each inmate, through good behavior, can progress through the system (no one is locked into a low level where stress is high). Dr. Granacher testified that certainty about rules and expectations actually *reduces* stress.

This testimony overlooks two factors which were demonstrated beyond doubt at trial. First, the stress and other adverse psychological impact of the system demonstrated by plaintiffs are not related to any single deprivation or any single level of the system. The adverse consequences flow from the fact that inmates are in constant fear that even the most basic "privileges" (*e.g.*, wearing one's own clothes or going to bed after 9:30), which have taken months to build up, can be withdrawn in an instant due to a single, isolated act of misbehavior. (*See e.g.*, Testimony of Betty Jane Starks, President of the KCIW, Resident Liason Council, Mary Katherine Shadrick, and Brenda Griffett). This apprehension is increased by the knowledge that a relatively minor act of misconduct can result in the loss of levels. (See PX 137).

In the words of one inmate, "it scares me to death" that an isolated human error could result in the loss for months of "privileges" which in reality are routine aspects of daily life. (Griffett Testimony).

Second, there simply is no certainty about the rules and expectations of this system. No one, including the staff, knew exactly what the rules are. Dr. Granacher was unaware of the extent to which uncertainty pervades the system, but he candidly conceded that if major inconsistencies and uncertainties existed, the operation of the system would be undermined.

Nevertheless, Dr. Granacher concluded that "it cannot be determined" if plaintiffs have suffered psychological harm as a result of the Levels System. Similarly, Dr. Granacher concluded from the results of mental status examinations conducted on the named plaintiffs, that there was no way to tell if their psychological problems were related to the Levels System or were solely attributable to unrelated or pre-existing psychological conditions.

Defendants also offered results of thirty Minnesota Multiphasic Personality Inventory (MMPI) tests given to members of the plaintiff class to show the absence of psychological harm. Defendants contend that if indeed the Levels System inflicts psychological injury, the harm would be reflected in the test results. The MMPI is designed to measure personality traits, not to measure the psychological impact of an experience or a system. (Testimony of Dr. Curtis Barrett, professor of psychiatry and behavior sciences, University of Louisville). Serious questions exist about the methodology employed in selecting the inmates who were tested and in the administration of the tests (*See* plaintiffs' cross-examination of Dr. David Roebker, and Testimony of Dr. Curtis Barrett). Without addressing those questions, and taking the test results (DX 97) at face value, the Court is unable to draw any conclusions whatsoever about the psychological impact of the Levels System from the results of these tests.

Courts are not the best forum for testing the validity of scientific theories, but Courts are well equipped to determine if a system is punitive. Much of the evidence at trial concerned psychological and psychiatric effects of the Levels System. The Court finds the testimony of Dr. Nietzal, Dr. Mi-

lan and Dr. Baxter persuasive in demonstrating the punitive and harmful effect of the Levels System. The testimony of Dr. Granacher, however, showed how difficult it is to measure the psychological impact of this system on any individual in a way that is scientifically verifiable. This Court finds that the Levels System has a harmful impact on the plaintiff class which is attributable to the punitive and arbitrary nature of the system.

This harmful impact is evidenced by unusually high levels of stress, tension and sleep disturbances, and by the widespread reliance on psychotropic drugs. These indicators of harm may or may not demonstrate psychological harm to experts in the field, but they prove to the satisfaction of the Court that the system does not achieve its stated goal of "promoting personal growth, a positive attitude and socially acceptable behavior." (PX 122). They demonstrate not only the absence of a positive impact, but the presence of a negative effect. It is not for this Court to decide if the system's negative impact can be clinically diagnosed or if it is properly classified as psychological injury. The Court, however, must decide whether the system is punitive, and the indicators of harm described above bolster the Court's conclusion that the system is fundamentally punitive.

The Court, in summary, is convinced that the Levels System is harmful to the plaintiff class. It is punitive and unsupported by any valid correctional goal. It alters conditions of confinement in a way qualitatively different from punishment to which persons convicted of crimes are normally subjected. It undermines the ability of inmates to acquire the relational skills needed to achieve rehabilitation and re-integration into society. Whether the harm inflicted results in measurable and lasting psychological injury is uncertain. But there is no question that the system has a detrimental effect on the plaintiff class members while they experience it. The system results in massive disparities within Kentucky's penal system between male and female prisoners in the availability of privileges and the opportunity to fulfill basic human needs.

These pervasive disparities exist without state purpose or penological justification to support them.

## B. VOCATIONAL EDUCATION, TRAINING AND JOBS

The Corrections Cabinet offers vocational education and training programs to prisoners in order to facilitate their re-integration into society. These programs fall into four general areas: vocational school courses within the institutions, prison industries and farms, on-the-job training (OJT), and community based programs. Because all women offenders are classified to KCIW on the basis of gender, they are denied access to many vocational education and training programs which are available to male prisoners. Of the programs which are available to females at KCIW, many are inferior in quality to the corresponding programs at the male institutions.

The vocational school courses are operated by the Department of Education's Bureau of Vocational Education, under an agreement with the Corrections Cabinet. (PX 42). Prisoners are enrolled as students in vocational schools inside the prison walls in this joint Education/Corrections program. (Spillman Testimony). Prison industries provide prisoners with the chance to work in an environment similar to that of private industry on the outside. Inmates manufacture products such as soap, furniture and license plates, for use by other units of government. See K.R.S. 197.200, et seq. Emphasis on worker productivity and operating within a budget make this the closest thing to "real world" work in a prison. (Lawson Testimony). OJT, as the name implies, is designed to teach skills through on the job experience. Inmates carry out institutional janitorial and kitchen duties and are trained to perform the basic tasks of institutional maintenance (e.g., plumbing, electrical and masonry work) necessary to keep the extensive physical plants of the institutions in working order. (Shirley, Campbell, Johnson Testimony). Community programs include employment with government agencies, voca-

tional study release (attending outside vocational school while residing in half-way houses), and a gradual release program for inmates who are closely approaching parole or who have met parole guidelines but need a job or placement before release. (Kassulke, Shirley and Lowry Testimony).

Defendants, in their own internal policy statements, advance vocational education and training as the preeminent goal of the institution. The KCIW philosophy statement reflects this commitment: "The Kentucky Correctional Institution for Women's primary program thrust is that of preparing women to return to the community as employable citizens." (PX 19, Chap. III, p. 2). There is a wide gap, however, between this statement of philosophy and the practical reality of inferior vocational programing at KCIW.

### 1. *Vocational School Courses Within the Institutions*

KCIW has only two vocational course offerings for female inmates: business office education (BOE) and upholstery. (PX 23). At the time of the trial, one of these, upholstery, was closed because the teacher quit and a replacement had not been hired. The courses are of limited value in today's competitive job market due to the absence of modern equipment. The BOE course has. no word processing component and the upholstery course had no commercial scale equipment and only one operational sewing machine. (Lawson, Turner and Sielaff Testimony).

These courses for women, moreover, are offered only part-time basis, while the vocational courses at the men's prisons are full-time. Part-time courses are less effective than full-time courses in vocational education due to the importance of combining instruction with production. (Lawson and Spillman Testimony). Defendants maintained the part-time courses allowed greater flexibility, enabling women to work toward completion of their general education development (GED) course while receiving vocational training at the same time. (Kassulke Testimony). This opportunity for diversity may be desirable in some settings. It seems questionable, however, at KCIW, where only two vocational courses are offered, one of which (BOE) requires as a prerequisite significant skills in spelling and grammar. The BOE course in the morning is not very helpful to an inmate who has yet to complete the GED course in the afternoon because she must learn to read and spell *before* she can type and perform other business office skills. (*See* Karen McAuliffe Testimony).

Similar problems plague the upholstery course. Apart from the difficulty of keeping a teacher employed, the lack of up-to-date equipment makes it difficult to learn skills which can lead to a job. (Testimony of Alice Turner, Director of Blitz House). Since only one woman could operate the single sewing machine at a time, the primary focus of the class was domestic, not commercial, upholstery. Lack of equipment inhibits the learning process (Spillman Testimony) and there is unrebutted testimony that lack of supervision led to a great deal of idleness while the program was in operation (Martinez and Marshall Testimony).

The BOE course prepares women who complete it successfully for jobs with an average salary of $11,481, according to the U. S. Department of Labor's Bureau of Labor Statistics. For women who complete the upholstery course, and find a job in that area in spite of the lack of training in commercial skills, the average salary was $12,212 in 1981. (PX 161, Denison Testimony). By way of contrast, men are offered training in fourteen different trades,[8] with average annual earnings ranging from a

---

**8.** Inmates at KSR may take courses in the following areas: auto body, auto mechanics, carpentry, drafting industrial electricity, masonry, plumbing, printing, radio and television repair, small engine repair, upholstery, and welding. KSP inmates can receive training in plumbing, masonry, auto body, small engine repair, air conditioning, and welding. Consent Decree § 4, p. 9, PX 4. Vocational courses available for minimum security men at Blackburn Correctional Complex are: building and trades, welding, masonry, meat cutting, air conditioning, refrigeration, and drafting. PX 19, Chap. XI, p. 5.

*low* of $12,212 for upholsterers to a high of $20,216 for pipefitters. The average annual salary for trades in which men can receive vocational training is $16,726.21. For women, the average is $11,846.50. (PX 161). There are 81 jobs in the U. S. Labor Department's Dictionary of Occupational Titles (DOT) for which men at Kentucky State Reformatory (KSR) are trained. At Kentucky State Penitentiary (KSP), men can receive training for 47 DOT job listings. There are only 17 job titles in DOT for which women at KCIW receive training. (PX 23).·

Defendants made no attempt to show that the quality of the vocational courses at KCIW is comparable to the quality of the courses at KSR and KSP. Rather, their defense has been that the percentage of inmates enrolled in the courses at KCIW is comparable to or perhaps higher than the percentage of inmates enrolled at the men's institutions. (DX 148, Defendants' Post-trial Brief, pp. 7–9). A comparison of raw numbers in this area can be misleading. Close to 30% of the inmates at KCIW were enrolled in the part-time courses; at Blackburn Correctional Center, almost 26% of the inmates were enrolled in full-time vocational courses; 10% of KSR's inmates are in vocational school full-time; KSP has an 8.1% full-time enrollment. (DX 22).

KSR and KSP operate full-time prison industries which employ a high percentage of male inmates (20% at KSP, 10% at KSR, (Parke and Rees Testimony). Male inmates at KSR, KSP, and BCC are also employed in significant numbers in full-time on-the-job training programs in skilled trades. (PX 11, p. 2 and Attachment 5, PX 19). Thus the percentage of inmates receiving the equivalent of full-time vocational training is substantially higher at all male institutions with in-house vocational courses than at KCIW. Indeed, the percentage of male inmates in institutions with in-house vocational courses who get full-time vocational training is higher than the percentage of KCIW inmates enrolled in the half-time courses of inferior quality.

Another factor concerning the vocational school courses offered within the institutions deserves comment. Warden Parke and Warden Rees testified that there were serious problems at KSP and KSR in keeping enrollment in the vocational courses full. The problem is particularly bad at KSR due to the high turnover in population necessary to keep the inmate count within the limits agreed to in the *Thompson* litigation. (Rees Testimony). Lack of interest and motivation, in addition to the turnover problem, have resulted in an average of 20–30 vacancies in vocational courses at KSR (Rees, Campbell Testimony). KSR has had to assign recruiting duties to a staff person in order to increase enrollment (Campbell Testimony), while approximately 15 miles away at KCIW, women who are highly motivated and have exhibited a strong interest in these courses, are unable to receive similar instruction. Thus, vocational courses are available to many men at KSR who have no interest in them, and unavailable to female inmates at KCIW who want and need the training.

The in-house vocational school programs are federally funded under the Vocational Education Act of 1976, 20 U.S.C. 2301 *et seq.* This funding comes through the Bureau of Vocational Education and is matched on a dollar-for-dollar basis with funds appropriated to the Corrections Cabinet by the Kentucky General Assembly. (PX 23). The vocational classes offered within the prisons operate as extension centers of the Bureau of Vocational Education's Area Schools. KCIW and KSR are extensions of the same area school and report to the same Regional Director in the Bureau of Vocational Education. (PX 23). The state has received federal money for prisoners' vocational training as part of a program in which the Department of Education made the express assurance to the United States that it would:

> *encourage and promote the enrollment of both men and women in all programs and courses supported under the Act and managed by the state Board and eligible recipients.*

Annual Program Plan for 1982 and Accountability Report for 1980, Ky. Department of Education, Bureau of Vocational Education, PX 170, at X (first excerpted page).

The projected federal contribution under this program for 1982 is $422,850 (See PX 170, Table 9b). The amount was $348,049 in 1981 (PX 168, Table 10) and $338,506 in 1980 (PX 170, Table 13). The Cooperative Agreement under which the joint Corrections/Education vocational program operates (PX 42) contains no restrictions which would prevent the enrollment of women in courses at KSR. Dr. Robert Spillman, the Department of Education's Assistant Superintendent for Vocational Education, testified that the better educational practice is to operate co-ed programs, but that the vocational courses operated inside prisons remained segregated by gender because of the internal policy of the Corrections Cabinet.

Concern was expressed over possible security problems which could arise if KCIW inmates were allowed to take courses at nearby KSR. (Rees Testimony). The record shows that men from the West Kentucky Farm Center are bussed to nearby KSP, however, in spite of those same security concerns, for the purpose of taking vocational courses. (Parke Testimony). To the extent the security concerns differ because of the gender of KCIW inmates, the record shows female inmates have successfully completed paralegal training in a co-correctional class without incident, (McAuliffe, Jarvis Testimony), although additional security was provided. (Kassulke Testimony). Females have been employed as guards on a widespread basis at KSR, without any remarkable problems. (Rees Testimony). The vocational courses at KSR have a low student-teacher ratio and are closely supervised. (Campbell Testimony).

The internal policy of the Department of Corrections prohibiting co-correctional programs sharply limits the availability and quality of vocational education at KCIW. According to Dr. Spillman, a witness called by defendants, "It's almost futile to start a non-traditional program for women" unless the program is integrated by gender. Non-traditional job training, defined by Dr. Spillman as courses offering preparation for jobs in which 80% of the workers are of the same sex, includes most courses which could prepare inmates for jobs in skilled trades with high wages.

2. *Prison Industries*

The most effective way of teaching marketable skills to inmates is through use of a prison industry program. (Testimony of Robert Lawson, former Director of Industries, California Department of Corrections). Prison industries are run like a business, to the greatest possible extent. Inmate workers are placed in a work environment closely approximating real world conditions. This facilitates development of job skills, inculcates work habits such as punctuality and dependability, and promotes realistic expectations about employment that are necessary to get and keep a job. Inmate workers are held accountable for the quality of their work and held to a standard of productivity. This is a particularly valuable program for inmates who lack job experience. As defendants' research points out, "it is evident that Kentucky's offenders are deficient in vocational training and job readiness skills," (*See* A Description of Classification and Program needs of Kentucky Offenders, PX 6), the precise skills promoted by the prison industries program.

The need for job readiness skills is particularly evident among female offenders. Table 9 of PX 6 shows that 44% of all female offenders in Kentucky have never held a job as long as one year, as compared to 37% for males. Of the inmates at KCIW, 69% were unemployed or had been working three months or less at the time of their arrest, as compared to 52% for males. The need for skills promoted by prison industries therefore appears more acute for female offenders. Yet not a single prison industry is operated at KCIW, or is otherwise available to women inmates. KSP, KSR and Luther Luckett, on the other hand, all have prison industries programs for male offenders.

KSP has a population of about 900, with 15–20% in segregation, protective custody or otherwise unavailable for employment in prison industries. (Parke Testimony). The Garment Plant at KSP employs between 75 and 105 inmates producing shirts, pants, underclothes, jackets, mattresses, sheets, pillow cases and other such goods. The KSP Upholstery and Re-Upholstery Shop employs eight to fourteen inmates in the manufacture and repair of office chairs, sofas, and many other upholstered items. The Mill Room of the Furniture Plant at KSP employs fifteen to thirty inmates in custom woodworking, building conference tables, credenzas, and bookcases. Eighteen to twenty-four inmates work in the Fiberesin Department of the KSP Furniture Plant, producing desks, typing tables and file cabinets. The KSP Metal Plant has eight to twelve inmates trained as welders, cutters and grinders, producing chairs, tables and other metal products. (PX 29, KSP Answers to Interrogatories).

KSR operates similar programs in which inmates re-cap tires and manufacture soap, license tags, validation stickers. (Campbell Testimony). A print shop which was formerly operated by male inmates at Blackburn, is now being relocated to Luther Luckett. (Seabold Testimony).

Defendants maintain it has been impossible to operate an industry at KCIW due to the small population. (Kassulke Testimony). They assert that, with the increase in population resulting from the closing of the Daniel Boone Career Development Center, consideration is now being given to establishing an industry at KCIW. The only industry under active consideration, however, is a keypunch operation (Kassulke Testimony, DX 16) which would offer training in a low-paying, sexually stereotyped job which, according to Dr. Spillman, will probably be rendered obsolete by improved technology in the near future. (See also PX 161, Testimony of Elsie Denison, labor economist and specialist on women offenders, U. S. Labor Department, Women's Bureau).

Examination of the composition of industries at KSP casts doubt on defendants' assertion that KCIW's relatively small population precludes operation of an industry. Of the five industrial operations at KSP only the Garment Plant employs more than thirty prisoners. Two KSP industries, Upholstery and Re-Upholstery and the Metal Plant, require only eight to fourteen inmate employees. The Mill Room operates with fifteen to thirty workers and eighteen to twenty-four laborers are employed in the Fiberesin Department.

Finally, it should be noted that, while prison industries are designed to be self-sustaining, the program at KSR has received substantial federal aid on at least one occasion. A two-part grant totaling $219,000 was awarded, under Title I of the Omnibus Crime Control and Safe Streets Act of 1968, to improve and expand the KSR validation sticker plant in 1979. (PX 72). This money from the Law Enforcement Assistance Agency (LEAA) was used entirely for the benefit of male inmates, despite a specific prohibition against sexual discrimination in the enabling Act. See 42 U.S.C. § 3789d(c)(1).

### 3. Inmate Wages

The absence of an industry and lack of maintenance jobs for females at KCIW deprives female inmates not only of the opportunity to acquire valuable skills and work habits, but also of the highest paying prison jobs. The average pay for KCIW women is $8.68 per month, and the highest pay a female can hope for is $1.25 per day. (PX 126). Prison industries, however, offer male inmates the chance to earn up to $2.25 per day. (PX 29, Campbell Testimony). Pay records reflect the fact that many male inmates are at the high end of this pay scale, earning over $60 per month. In contrast, the highest paid female inmate earns only $35 per month, and only three other women inmates earn over $25 per month. (PX 126).

The dramatic impact of prison industries and maintenance jobs on inmate wages is illustrated by a comparison of the chart

found on page 38 of the U. S. Post-trial Brief (which includes wages from prison industries) with the chart in Defendants' Post-Trial Brief on page 9 (which omits wages from prison industries). Defendants' chart shows the average monthly wage at KCIW was $9.09. This figure includes all wages, for females and the relatively higher wages for male KCIW inmate maintenance workers.[9] When the handful of male inmate maintenance workers are omitted, the average monthly wage at KCIW falls to $8.68. The average monthly wage for over 1500 inmates at KSR drops from $13.63 to $11.15 when prison industry wages are omitted. The average wage for the 212 minimum security men at West Kentucky Farm Center falls from $14.79 to $11.32 when industry wages are not considered. The average pay for the 267 minimum security men at Roederer Farm Center is $11.26; omitting industry wages, the average is reduced to $6.09. Thus, the negative effect of the absence of prison industries at KCIW is striking in the area of inmate wages.

### 4. *On the Job Training*

The Corrections Cabinet operates on the job training program for inmates which seeks to "simulate the employment market within the open community." (Report of the Ad Hoc Committee for Development of Job Descriptions, at ii, attached to PX 11). This program helps inmates through development of job skills and benefits the institutions through provision of services. The system includes eleven main categories of services: food, laundry, janitorial, maintenance, landscape, clerical, medical, personal, industrial, agricultural, and domestic. (*Id.*).

Within the eleven main categories, there are 84 different job descriptions. Jobs are broken down according to skill levels, and pay increases incrementally with increased skills. *See* IMD 6.10, Joint Exhibit 8 and PX 11.

Women have been excluded entirely from industrial services, agricultural services, and maintenance services. Maintenance services—keeping the physical plant of the institution in operating condition—have traditionally been performed at KCIW by male inmates imported from KSR. Many of the most valuable and marketable skills such as plumbing, electrical, masonry, mechanical and carpentry, can be developed in the maintenance services. Well after the filing of this lawsuit, in the months preceding trial, the all male KCIW maintenance crew was integrated with the assignment of one woman, Patty Lettelier,[10] as a maintenance worker. The formal policy of excluding women from the maintenance crew appears to have been in effect until after the closing of Boone and the return of those minimum security inmates to KCIW.

Although the formal policy of excluding women from maintenance crews has been recently modified, women who desire these jobs are still subject to a number of significant restrictions not imposed on male inmates. To be eligible for the maintenance crew, women must live outside the prison fence in the staff house (Gardner, Lettelier and Chandler Testimony). Thus medium and maximum security females are automatically ineligible. A strict "no talking" rule is maintained banning all women inmates from communicating with the male inmates at KCIW,[11] although an exception

9. U. S. calculations show the average monthly wage at KCIW is $9.27 when male inmate maintenance workers are included. U. S. Post-trial Brief, p. 38. Giving defendants the benefit of the doubt, the Court will use their figures for purposes of illustration.

10. The attitude of some KCIW officials is revealed by a gratuitous order that was issued requiring Ms. Lettelier to take birth control pills while assigned to the maintenance crew. Ms. Lettelier, insulted by the implications of this directive, objected to the responsible offi-

cials. After she had already been subjected to much humiliation, the order was rescinded. (Lettelier Testimony).

11. This rule is not, strictly speaking, a restriction on women who desire maintenance jobs, and the rule applies to women and men. It illustrates, however, an exaggerated fear of social contact between men and women inmates that manifests itself in a hostility to sexually integrating work opportunities. *See* n. 10, *supra.* As a result, women are not encouraged to seek opportunities that could enable them to

is allowed for the sole female on the maintenance crew during working hours only.

Because KCIW has no prison industry, no agricultural operation, and only extremely limited and recently opened opportunities for maintenance work, a large plurality of female inmates are assigned to the chores of cooking and cleaning. (*See* PX 1). According to the Lawson testimony, based on defendants' classification lists (PX 19 and 47), 5–8% of the male inmates are assigned to janitorial work, compared with 30% of the women prisoners; kitchen work employs approximately 6–10% of men prisoners and 17–19% of female inmates. Thus, even taking into consideration the half-day job assignments at KCIW, a disproportionately high number of women are assigned to these tasks. In fact, Lawson testified that even the lower percentage for men often reflects overclassification to cooking and cleaning jobs.

Defendants assert that women have been excluded from maintenance jobs and other skilled labor in part due to their lack of skills. (Kassulke Testimony). Inmate Mike Bolton, a member of the KCIW maintenance crew, testified he had some experience as a maintenance worker before coming to KCIW, but many of his skills have been acquired since he began work at KCIW, by learning on the job. This appears to be the way defendants envision the OJT program should work. (PX 11, IMD 610).

The Corrections Cabinet has instituted a valuable new element to the OJT program which could correct the problem of a lack of qualified female inmates, if such a problem does exist. Classroom components have been added to OJT assignments, enabling prisoners to learn new job skills from trained professionals. These programs have been implemented over the last year at Blackburn, KSR, KSP, and Luther Luckett in food services and building maintenance. (PX 11, Attachment 1). Thus, while defendants import men to do maintenance work at KCIW, maintaining women are unqualified for such labor, new programs have been instituted to teach these skills to men; no such program is available to women at KCIW who desire to learn these skills.

This lack of opportunity for training in marketable skills through the OJT program at KCIW led Professor Sielaff to characterize OJT as "virtually non-existent" at KCIW. Even in the areas of cooking and cleaning, where so many KCIW inmates are assigned, there is no effort made to develop the kind of skills that could lead to jobs in commercial janitorial or food service industries. Thus, as numerous inmates testified, the janitorial pool is often reduced to "make work," with the actual cleaning required completed in the first 45 minutes of a three-hour shift. (*See, e.g.*, Testimony of Karen McAuliffe, Ethel Kissic, and Octavia Gardner). The Court finds this testimony credible in view of the fact that close to fifty women are assigned to three-hour cleaning shifts on a daily basis. (PX 1). This is the equivalent of having 15–20 full-time forty hour per week janitors in a building no larger than a typical neighborhood school.

Another adverse effect of the disproportionate concentration of women in cooking and cleaning jobs is lower pay. Under the pay scale set forth in IMD 610, jobs requiring greater skills receive greater pay. Thus over-assignment of women to low-skill cooking and cleaning jobs results in lower wages for KCIW inmates. All of the male institutions have a significantly higher proportion of inmates on the high end of the inmate wage spectrum. (See IMD 610 and summary of job assignments attached to PX 11).

A final area of disparity in the area of skill development opportunities is the access to the CETA funded Community Placement Center at the Luther Luckett Correctional Complex. This three-week program trains inmates in job survival skills and provides assistance in finding jobs. Inmates accepted into the program receive a stipend of $100.50 per week, plus $5 per dependent.

learn nontraditional skills that could lead to higher paying jobs.

(PX 66, PX 142, PX 58). While these elements of the program would make it attractive to any inmate, the most crucial advantage offered by the Community Placement Center is that Kentucky Parole Board accepts completion of the program in lieu of employment for purposes of parole. Although the central office staff has recommended opening the program to women inmates, (PX 15), the Community Placement Center remains closed to all females. Women inmates thus have no similar means of satisfying the Parole Board's job requirement, and there are women who desperately need such help. (See *e.g.*, Testimony of Jeri Marshall).

### 5. *Community Study and Work Release Programs*

Minimum security inmates are eligible to participate in community based programs. KCIW, following the close of DBCDC, has instituted a program allowing minimum security inmates to attend Jefferson State Vocational School (JSVS). (Kassulke Testimony, DX 137). The program has been a success, according to Kathleen Meixel, admissions director of JSVS. Ms. Meixel testified that "inmates are model students" and several teachers "wish they had a whole classroom full of inmates."

Male inmates also attend JSVS, but under different terms. Female inmates at Jefferson State are bussed to school, a 75-mile round trip per day. The male inmates, with the help of a CETA grant (PX 69), live at a half-way house within walking distance of the school and thus have more freedom, easier access to school, and greater opportunity for contact with friends and loved ones. Although the half-way house is co-correctional, accepting women prisoners in federal custody, defendants have excluded women from this CETA program.

David Lowry, director of the Dismas House, testified that his organization was both willing and able to accept female prisoners in state custody. Defendants maintain it is more economical to house women at KCIW and bus them to JSVS. (Kassulke Testimony). This explanation seems dubious in view of the fact it cost $33.24 per day (in 1981 dollars) to house a woman at KCIW (DX 22, p. 3), while it cost $16 per day (in 1982 dollars) to house an inmate in Dismas House. (PX 138, p. 2). The explanation would make sense if unused bed space was available at KCIW, but in fact the institution is extremely crowded,[12] with less space per inmate than is available at KSR (PX 4, § 2). Inclusion of women in this CETA grant would be an economical way of addressing the overcrowding problem at KCIW, a fact recognized by defendants' own central office. (DX 8, p. 1).

Defendants have recently instituted a non-traditional job education program for minimum security women at KCIW, funded with a CETA grant. (Samantha Rivers Testimony, DX 83). This program was started to compensate for the loss of minimum security programs which occurred when Boone closed. Defendants, however, are seeking to expand this program by making it available to women on the prison grounds. (DX 5). Similar CETA programs exist at the male institutions.

KCIW instituted a single community service program allowing minimum security women to work at public service jobs in government in the fall of 1981. Once again, this program was initiated upon the closing of DBCDC. The program consists of six positions at Central State Hospital as maintenance workers, housekeepers, and nurses' aides. (PX 13, ¶ 20c). This is the same type of program offered in greater variety to men at the all male minimum security institutions: Frankfort Career Development Center, Bell County Forestry Camp, Roederer Farm Center, and West Kentucky Farm Center. *See* PX 19, PX 31, PX 32.

The Corrections Cabinet operates a pre-release program under IMD 606, in addition to the community programs discussed above. The pre-release program is geared to meet the needs of inmates who are near parole or have met parole guidelines but

---

12. *See* discussion of overcrowding, § 1(c)(1), *infra.*

need a job before release. The goal of the program is "to prepare inmates for stable employment and re-integration." IMD 606.01. There are three sub-parts to this program: 1) Vocational Training Release; 2) Gradual Release; and 3) Expedient Release.

Vocational Training Release is a program created by statute to allow inmates to participate in a community based vocational training program during the inmate's last ninety days of confinement. K.R.S. 439.-640, 501 K.A.R. 2:010, IMD 606.02. This program helps ease the transition into the community by allowing selected inmates to get a head start on job searches or to participate in vocational training in the communities in which they will soon be released.

Vocational Training Release under IMD 606, however, is open only to males. One of the eligibility requirements is that participating inmates must "have resided at Blackburn Correctional Complex or Frankfort Career Development Center [both all male institutions] for one hundred eighty (180) days prior to their regular parole hearing date." Since many of the community correctional centers used to house prisoners in this program are county jails which regularly house other female prisoners, the reason for excluding women from this program is unclear.

The Gradual Release Program serves the same function as Vocational Training Release. It is, however, designed for inmates who have already received a favorable recommendation for parole, but do not qualify for release due to lack of an acceptable home or job placement. IMD 606.13. This program, again, gives participants a significant advantage in finding the jobs they need to secure release by putting them in the community, with easier access to employers. Eligibility is restricted to "inmates from adult *male* institutions," according to defendants' Classification Resource Booklet. (PX 19, Chap. XII, p. 2). (emphasis added).

Brenda Griffett, a former KCIW resident, was aware of the Gradual Release Program because her co-defendant, a male,

was able to take advantage of it and return to their hometown, residing in the Clarke County jail for the last part of his term. When Ms. Griffett inquired about the program, county officials in her home county indicated a willingness to accept her. (Griffett Testimony). The Deputy Commissioner of Corrections, however, informed Ms. Griffett's family that she was not eligible for the program for the simple reason that she is a woman and:

> The only place that women sentenced to prison in Kentucky can serve their time is at Kentucky Correctional Institution for Women. Therefore, there is no way that I can assist in getting Brenda transferred to the Winchester jail.

Letter from Deputy Commissioner Dewey Sowders to Ms. Mary Stone, October 6, 1981, (PX 143).

The third form of pre-release is "expedient" release. This program is defined as a means to expedite the release of inmates who have been recommended for parole. It is "available for inmates in minimum security institutions who have employment and home plans confirmed by letter a month before the regular Parole Board hearing date." IMD 606.01. Kentucky no longer has a minimum security institution for women, and it is unclear from the record whether this program is currently available to women.

The defendants have recently (two weeks before trial) changed their policy and have opened a single jail—Boone County—to three KCIW women for gradual release. (Ketron Testimony). Although the community release and reintegration programs have received grants from the LEAA totaling $153,298 (PX 74 and 74a), which by law may not be used in a sexually discriminatory manner, all other community release centers remain closed to female offenders.

### 6. *Other Minimum Security Disparities*

Many of the areas in which minimum security women are offered inferior opportunities and programs are discussed in the previous section. The full impact of the closing of the Daniel Boone Career Development Center cannot be appreciated, how-

ever, without further comparison of the opportunities for minimum security men and women.

In addition to their exclusion from Vocational Training Release solely on the basis of sex, minimum security women are denied many other valuable programs available to men. There are two farm centers, Roederer and West Kentucky, which offer a wide variety of agricultural jobs to men only. (O'Dea Testimony, PX 19). The Frankfort Career Development Center offers the opportunity for eighty (80) male inmates (DX 22) to work in state agency or non-profit community work (PX 19, Chap. IX, PX 33). The Bell County Forestry Camp provides minimum security men with work outside the confines of a prison in forestry and park jobs (PX 19, Chap. VI, PX 34). Blackburn Correctional Complex offers extensive opportunities for vocational, agricultural, academic, and community release programs far superior to those available to minimum security women at KCIW (PX 19, Chap. XI).

Certainly, KCIW cannot be expected to provide the small number of minimum security women an identical number of programs. The quality, as well as the quantity, of programs for minimum security women, however, is markedly inferior. The only vocational courses available at KCIW for minimum security women are the same two inadequate courses offered to the general population. Women who qualify as community minimum in custody grade may take courses at JSVS (with a 75-mile round trip commute) or work at Central State Hospital, but only twelve female inmates, less than half those with minimum custody ratings, meet this requirement. (PX 1). Similar inadequacies and disparities are pervasive in the areas of on the job training, work assignments, academic opportunities and opportunities for community release and recreation.

## C. GENERAL CONDITIONS OF CONFINEMENT

There are a host of factors which must be weighed in considering a claim that conditions of confinement constitute cruel and unusual punishment. Evidence was presented at trial on concerning overcrowding, medical and psychological care, visitation, disciplinary and grievance procedures, access to courts, recreation, education, religion, provision of personal hygiene supplies, and physical access for handicapped persons. The Court will attempt to address each of these areas, bearing in mind that many areas are inter-related and each is a contributing factor to the totality of conditions under which plaintiffs are incarcerated.

### 1. *Physical Plant And Overcrowding*

KCIW was designed to house a maximum of 110 inmates and its average daily population ranged from 93 to 112 from 1977 through 1981 (DX 22). Two factors have recently created a population problem at KCIW for the first time in recent years [13]: the closing of Daniel Boone Career Development Center and a dramatic increase in commitments in the first months of 1982. KCIW had to house 30 new minimum security inmates on only one week's notice when DBCDC was suddenly closed in September, 1981. (Kassulke Testimony). With the opening of the staff house as a minimum security unit, KCIW was able to physically accommodate the 30 new inmates. Shortly after the closing of Boone, however, KCIW experienced a sharp rise in intake. Superintendent Kassulke, noting that the population reached an all-time high of 174 during the trial, acknowledged that the unpredicted rise in intake has presented space problems for the institution.

Most of the inmates at KCIW are housed in two large rooms on the second floor of the main building, known as the A & B dormitories. Each of these rooms is 36' by 67'; with 2,412 square feet of floor space. (*See* DX 8, p. 5). Defendants housed thirty-six to forty women in each of these rooms at the time of the trial and assert this

**13.** Defendants' own documents show that KCIW was 25–33% over capacity when Boone was opened to relieve the overcrowding in 1976. PX 21, p. 2.

arrangement complies with the American Correctional Association (ACA) standard of 60 square feet per inmate (ACA Standard 4144, 1st edition). Mr. Sam Hoover, plaintiffs' expert in public health and sanitation, explained how the ACA standard takes into consideration many factors other than floor space in order to ensure public health hazards are avoided. Under the cited ACA standard, for example, 60 square feet of floor space is deemed sufficient in open dormitories *if* there is adequate ventilation, access to hot and cold running water, sufficient lighting (20 footcandles), access to toilets and showers, and clear visual lines of observation for the staff. Mr. Hoover also emphasized that, contrary to defendants' calculations, space necessary for fire egress should not be included in computation of available living space in a dormitory area.

The most severe crowding occurs in the Admissions and Orientation Unit (A & O). This unit located on the third floor of the main building consists of three bedrooms (approximately 11′ by 10′), two bathrooms, an office (11′5″ by 9′9″), a 16′ by 10′ dayroom, and a narrow hall. (DX 8, p. 5). During the week before the trial began there were 21 women classified to A & O. (PX 1). Ms. Loving, Director of A & O, testified there were 17 women classified to A & O during the trial. A & O programming for 16–20 inmates is held in the small dayroom. Each bedroom is double-bunked, with four inmates in each 110 square foot room. The overflow from A & O is housed in the infirmary (Loving & Starks Testimony). At the time of Mr. Hoover's inspection, the fire escape door was blocked by a mop rack, no keys were available to unlock the door (nor was anyone sure where they were) when the rack was removed, and no fire escape signs were posted. (Hoover Report, PX 173, p. 25). The Kentucky Department of Human Resources Bureau for Health Services cited overcrowding in this area as an environmental sanitation problem in February, 1981, and again in January, 1982. (DX 47 and DX 51).

The first floor of the main building contains only one housing unit, the annex, although the infirmary is now also being used to house A & O inmates. The annex, adjacent to the infirmary (DX 8, p. 4) has 756 square feet and houses 12 inmates.

The second floor contains two windowless 10½′ by 8½′ rooms, called "the closets", and ten single cells which were used for segregation prior to the recent opening of the special management unit in the basement of the main building. (DX 8, pp. 3, 5). Each of the closets houses two women. Although these rooms are crowded and have no windows, they are popular as living areas because they are at least semi-private. Mr. Hoover testified no inmates should be housed in the cells due to lack of an adequate means of fire egress.

The cottage can house 11 women and the minimum security unit (staff house) can house 29, according to DX 8. The first floor of the staff house, however, was still being used for office space at the time of the trial. (Kassulke Testimony). Only the 18 beds on the second floor of the staff house were available for inmates. (DX 8, p. 7). Mr. Hoover testified the cottage could adequately house 9 inmates, and the staff house could house a total of 21.

Using DX 8 as a guide, there was enough space for 143 beds [14] at the time of trial. Yet the population was as high as 174 during this period (Kassulke Testimony). The average daily population for the first four months of 1982 was over 161. (DX 161, Population Reports, last page).

It is apparent that the 143 figure stretches the capacity of the institution to the limit, taking into account only square footage for beds.[15] When environmental

14. 11 in the cottage, 18 in staff house, 80 in the dorms, 10 in the old cellblock, 4 in the closets, 8 in the A&O unit, 12 in the annex. DX 8.

15. The "contemporary standards of decency" which must be applied in this area are not easy to define. Yet, as Mr. Hoover pointed out,

Nazi war criminal Albert Speer was incarcerated in a cell with 85.4 square feet of space, an open cupboard, and other amenities, during a

factors such as ventilation [16], lighting [17], heat [18], plumbing [19], and fire safety [20] are taken into consideration, it becomes evident that health and safety hazards exist which are attributable to overcrowding. The increased work load placed on the staff and increased levels of tension and stress (Testimony of Dr. Milan, Dr. Baxter) are not least of the difficulties increased by overpopulation.

The record demonstrates that Superintendent Kassulke and the on-the-line staff of KCIW are not insensitive to the problem of overcrowding. The administrative officials at KCIW, however, have been put in a most difficult position due to the abrupt decision to close DBCDC. This decision was made by the Corrections Cabinet Central Office without consultation with officials at KCIW, and in combination with the dramatic increase in intake experienced this year, it has created a serious problem. There is a finite amount of space at KCIW, and the demands on it are increasing rapidly.

The public health problems posed by the growing demand on a limited amount of space can be seen in several areas,[21] but they are particularly acute in the area of waste water collection and disposal. There are at least three areas at KCIW where incoming drinking water pipelines are "cross-connected" with outgoing waste water pipelines (PX 173, p. 7). This presents a danger of back-syphonage, which could contaminate the incoming drinking water and result in diseases such as amoebic dysentery. (*Id.*). The KCIW water supply is derived from Floyds Fork, in an area where overflow from an open dump, a sanitary landfill, and an outfall for chlorinated effluent from the sewage treatment facility can drain into the creek. (PX 173, p. 6). Although defendants have made conscientious efforts to control water quality (*See e.g.*, DX 24–26), the problem remains. (*See* PX 173, p. 7). A related, and perhaps more serious, problem exists with regard to the sewerage treatment plant. The KCIW plant has a tank with a 10–15,000 gallons per day capacity. At the time of trial, due to increased population, it was being loaded at an average rate of almost 30,000 gallons per day. (PX 173; p. 9). Mr. Hoover testified that, based on its current capacity, the KCIW sewerage system was adequate to support an inmate population of 82.

The state agreed to the following standard for housing of male medium and maximum security prisoners in the Consent Decree entered in *Kendrick* and *Thompson*:

> . . . *the population in each and every housing unit at Kentucky State Penitentiary and Kentucky State Reformatory shall be the rated capacity of both institutions, using American Correctional Association Standards for dormitories at Kentucky State Reformatory, single cells for other housing areas at Kentucky State Reformatory, and single cells for the Kentucky State Penitentiary.*

PX 4, § 2, p. 4.

#### 2. *Medical And Psychological Care*

##### (a) Medical Care

Medical care at KCIW is provided by a consulting physician who spends two mornings per week at the institution. (Deposition of Dr. John Leland). In addition, there is one full-time resident nurse who has two licensed practical nurses under her supervision. The physician is on call when he is away from the prison. Nursing coverage is from 8:00 a. m. to midnight Monday through Friday, and noon to 8:00 p. m. on weekends. (Deposition of Pat Estes, R.N., pp. 10–11). KCIW also receives service

---

period in which retributory hatred against German war criminals was at its height; the war criminals were also allowed outdoor exercise for from 30 minutes up to 6 hours per day. *See* Hoover Report, PX 173, pp. 21–22.

**16.** PX 173, pp. 15–17.

**17.** *Id.*

**18.** *Id.* pp. 18–20.

**19.** *Id.* pp. 7–8.

**20.** *Id.* pp. 4–5.

**21.** *See* notes 16–20, *supra.*

from the South Oldham Emergency Medical Squad and a group of inmates who have completed emergency medical technician training. (Kassulke Testimony). A dentist visits KCIW one afternoon per week. (Kassulke Testimony, Estes Deposition, p. 54).

The infirmary at KCIW has 12 beds. (DX 8, p. 4). As previously noted, this area is serving as overflow housing for the A & O unit. Office space for the doctor and nurses is located next to the infirmary. (DX 8, p. 4). Due to overcrowding in A & O, double bunking has been resorted to in the infirmary. (Testimony of Betty Jane Starks, Dr. Granacher).

The medical records kept by the physicians list medication only, with no notation of history, physical exams or diagnosis. (Testimony of Dr. Barbara Starrett, Deposition of Dr. John Leland p. 66). Patients requiring specialty care or hospitalization are sent to University Hospital in Louisville. (Granacher, Starrett Testimony, DX 123). The record shows that outside referrals are made on a regular basis. (DX 124, DX 126). No evidence was presented to demonstrate that any female inmate had been denied treatment for a serious medical need. Defendants spent an average of $621.94 per inmate on medical care at KCIW in 1980–81, more than twice as much per inmate than at any other institution. (DX 22, p. 2).

### (b) Psychological and Psychiatric Care

The mental health care needs of inmates at KCIW are dealt with in several ways. A psychologist from the local mental health care regional center comes to the institution on a weekly basis, for individual counseling. A team from the newly opened Kentucky Correctional Psychiatric Center at Luther Luckett, composed of a psychiatrist, a psychiatric social worker, and counselors, visits KCIW one day per week. A local psychia-

trist performs evaluations for the Parole Board and is available in case of emergencies. A psychologist from the KSR staff regularly assists in evaluating special management inmates. The institutional chaplain conducts a counseling group on an ongoing basis. (Kassulke Testimony).

Inmates at KCIW exhibit an unusually high number of problems indicating mental health care needs are great at the institution. Dr. Leland, the general practitioner who provides medical care at KCIW, sees depression as a major problem, and prescribes psychotropic medication to a high percentage (33% to 50%) of the population due to widespread stress, anxiety, tension, and sleep disturbances (Leland Deposition, p. 36, Testimony of Dr. Robert Baxter). Defendants' own research department found 60 percent of the women at KCIW were suffering from high stress, a figure significantly higher than among male inmates (PX 6).[22]

The mental health care professionals serving KCIW deal mainly with acute problems of individuals with special needs. Only the psychologist from the mental health care facility provides ongoing therapy for general population inmates. Defendants' means of dealing with everyday problems of the general population is a self-help program called rational behavior counseling. (Testimony of Marie Loving, Dr. Max Maultsby). This program is taught to all new admissions by the A & O director in sessions which were characterized as "just a bunch arguing." (Lettelier Testimony). As a result of the lack of outlets for the sharing of emotional problems, many inmates rely on psychotropic drugs to cope with tension and insomnia. (DX 116). Many inmates with emotional problems check themselves into protective custody to avoid the pressure of confine-

---

22. PX 51, a report prepared by officials of the Department of Education, concluded on the basis of KCIW medical records and an evaluation of standardized tests, that 144 inmates should be classed as "emotionally disturbed" for purposes of planning the vocational education pro-

gram for 1980–81. The total number of inmates in custody during the last six months of 1980 was 189. The total in custody during the first six months of 1981 was 199. Population Reports, DX 161.

ment in the crowded dormitory areas.[23] (Testimony of Elizabeth Chandler, Assoc. Supt.).

3. *Visitation, Phone Calls and Recreation*

(a) Visitation and Access to Telephones.

Restrictions on visitation and phone calls have been discussed in the Court's findings on the Levels System, § I(A)(3), *supra.* Those findings will not be repeated here, but it must be emphasized that the Corrections Cabinet's own Internal Management Directives set forth specific guidelines on visitation. The philosophy of the Department regarding visitation is set out in IMD 403.01:

> The Kentucky Department of Corrections encourages visits to inmates by family and immediate friends to maintain morale and contact with the community. Relationships with significant others are to be promoted and facilitated by each institution as visits are important to the inmate and his success within the community upon release.

In accordance with this philosophy, IMD 403.04 mandates that "Visiting limitations and restrictive length of visits will be only to avoid overcrowding." The visitation policy at KCIW, as implemented under the Levels System, is in direct conflict with this departmental directive.

Restrictions on phone calls, also discussed at § I(A)(3), *supra,* deprive women inmates of substantial contact with the outside world available to male inmates. These restrictions are in part attributable to an outmoded telephone system. (Kassulke Testimony). The outmoded phone unit now in use requires a staff member to transfer an incoming line to the unit available to inmates. (Kassulke Testimony). Thus, the designated staff person (one of the two caseworkers) places each call. If a caseworker is not available, as is often the case, inmates are deprived of even the limited amount of time they are entitled to in theory (Martinez Testimony). If an inmate is lucky enough to get a call placed, her conversation is limited to ten minutes (five minutes if she is on level 1). (PX 122).

The Superintendent indicated consideration is being given to installing a new telephone line to avoid the cumbersome procedure which requires a staff person to place each call. There was no indication, however, that the sharp limitations on time and frequency of calls (one to three calls per month, with no call exceeding 10 minutes), imposed by the Levels System, would be removed.[24]

(b) Recreation and Outdoor Activity

Recreation for inmates is generally available in the evenings or week nights from 6:30 or 7:00 until 8:45 in the building known as the "barn." (Jane Thompson Testimony). Volleyball, pool tables, a basketball goal, shuffleboard, and weights are available in the barn. (Testimony of Jane Thompson, Ethel Kissic). KCIW has a tennis court and a large yard suitable for softball, football or other outdoor sports. Use of the yard is sharply curtailed, however, due to lack of staff. Superintendent Kassulke testified the yard could only be opened when a staff person was present to supervise because KCIW has no watchtower for guarding against escapes over the fence. Superintendent Kassulke testified on cross-examination that another reason the entire

---

**23.** As one inmate testified, "You can't even go to the bathroom by yourself at KCIW. Sometimes you just need to get off by yourself and have a good cry or something ... and you can't." (Lettelier Testimony).

**24.** In response to a grievance over lack of access to phones, Superintendent Kassulke considered installing a pay phone similar to ones in operation at KSR which would permit greater access, but would require a substantial charge for each call. The President of the Resident-Li-

aison Counsel, B. J. Starks, expressed concern that this would impose a hardship on the many inmates who are indigent, even though it would technically increase access. (DX 94). Of course, one reason there are so many indigent inmates at KCIW, upon whom this improved system would impose a hardship, is the discriminatory practices which result in markedly lower inmate wages at KCIW than at KSR and the other male prisons. *See* § 1(B)(3), *supra.*

female population was denied access to the yard during the day was that the five to seven men on the maintenance crew are not supervised. As a result, the women are locked inside for all but a few minutes during each day; two or three days per week the yard is opened sometime after the 5:00 p. m. count and closed before dusk. (Kissic Testimony). As a practical matter, therefore, outdoor recreation is generally unavailable to women at KCIW. This situation has drawn criticism from the attending physician at KCIW, who feels the lack of recreation and outdoor activity is harmful to the physical and mental well being of his patients. (Deposition of Dr. John Leland, pp. 38–39).

In contrast, male inmates have access to the outdoors during a large part of each day. KSP, the maximum security institution for men, is the most restrictive male prison with regard to yard time. Yet, even at KSP, the yard is open from 11:00 a. m. to 5:00 p. m. during most of the year and from 11:00 a. m. to 7:00 p. m. in the summer. (Parke testimony). Thus, men at the most restrictive male institution have more access to the outdoors in one day, than women at KCIW have in a normal week. Until recently, the yard at KSR was open from sunrise to sunset for all inmates during non-program time. Under the new policy at KSR, the yard is still open six to seven hours per day for all general population inmates. (Rees and Campbell Testimony).

4. *Disciplinary And Grievance Procedures*

The Adjustment Committee at KCIW adjudicates all allegations of disciplinary infractions. The Committee decides guilt or innocence and metes out punishment under the Department's Offense and Penalty Code (Joint Exhibit 4). The Committee's operation has historically been characterized by an extremely narrow view of inmates' rights in the discipline process.

The best example of the past operation of the Committee is the policy concerning confrontation and cross-examination of witnesses. According to Superintendent Kassulke and Associate Superintendent Chandler, an inmate had no right to confront and cross-examine her accuser until August of 1981. This policy of systematically denying all accused inmates the right to face their accusers was adopted on the advice of a former associate superintendent who believed it was *always* a security risk to allow an inmate to confront her accuser. (Kassulke Testimony). As a result of this policy, correctional officers who issue disciplinary write-ups never testify before the Committee. (Testimony of Carol Jarvis, Inmate Legal Aid). Thus, the Committee makes its decision based on the write-up and testimony of the inmates, with no opportunity to test veracity and reliability when conflicting versions of the facts are given.

The danger of this mode of procedure is apparent when the content of the disciplinary reports is considered. Correctional officers frequently issue incident reports concerning occurrences they have not witnessed. (See *e.g.* Chandler Testimony and Testimony of Mary Shadrick). This practice is in direct conflict with IMD 713.-03(D)(1), which mandates that incident reports should include only facts personally witnessed by the reporting officer. (*See also* Testimony of Gary Dennis, Director of the Bureau of Training). As a result of the routine violation of this IMD, frequently the only evidence presented against an inmate is a second hand hearsay report.

The lack of basic procedural safeguards, such as the right to cross-examine in the absence of a real security risk, leads to incongruous results. An example is the action taken against Wanda Hicks, an inmate charged with stealing a tool from the upholstery class and lying to an officer. (PX 162). The charge of lying to an officer was based on Ms. Hicks' denial of the theft. Ms. Hicks was acquitted of the theft of the tool due to a lack of evidence, yet, incredibly, was convicted of the charge of lying to an officer when she denied the theft. She was sentenced to five days in disciplinary segregation, and was demoted from Level 5 to Level 0.

Kentucky's prisons all have grievance procedures for resolution of internal problems that inmates have in the institutions. The procedure at KCIW, (PX 55 Resident Staff Handbook, p. 15), is the same internal dispute resolution mechanism at other prisons in Kentucky. Under the consent Decree in the *Kendrick* and *Thompson* litigation, however, there is a provision requiring that a grievance from KSP and KSR not acted on within the prescribed time limits must be resolved in favor of the inmate. PX 4, p. 23. Luther Luckett and the minimum security institutions for males, like KCIW, do not have this default provision in their grievance procedures.

### 5. Access To Courts

The law library at KCIW was woefully inadequate when this lawsuit was initiated. The Supreme Court Reporter had not been updated in over six years; of the nearly 400 Federal Reporters published since 1960, only 22 were in the KCIW law library; over one-third of the Kentucky Decisions from the Southwest Reporter, Second Series, were missing; there were no Shepard's Citations. (*See* Teitelbaum Testimony, PX 204). Since the initiation of this suit, defendants have made a significant effort to improve the holdings of the KCIW law library. (Joint Exhibit 1). The collection still does not include many basic books which must be provided at KSR and KSP under the Consent Decree in *Kendrick* and *Thompson*. (PX 4, § 8).

The law library is open to inmates from 12:30 p. m. until 3:15 p. m., Tuesday through Friday. Since these hours largely overlap with the afternoon program hours and work shift, the library is available only a few minutes each day unless an inmate gets permission to miss class or work. (Testimony of Carol Jarvis, and Elizabeth Chandler, Assoc. Supt.).

One attorney from the Kentucky Office for Public Advocacy visits KCIW for a half day every three weeks to assist inmates with criminal appeals. This attorney does not assist in civil matters or prison disciplinary proceedings, although most legal problems at KCIW concern civil matters, such as child custody. (Jarvis Testimony). KSP has three full-time attorneys serving around 900 inmates. (Parke Testimony). KSR has two full-time attorneys and one part-time, serving 1500 inmates a total of 96 attorney hours per week. (Teitelbaum Testimony). (*See also* PX 4, Consent Decree § 8).

### 6. Education And Religion

(a) Academic Programs

Women at KCIW can obtain a high school equivalency diploma through participation in the GED program. This is a popular program and 46 inmates were enrolled in the month before the trial began. (Jane Thompson Testimony).

In addition to the GED course, inmates may enroll in an evening college-level program which Jefferson Community College offers at the institution. Minimum security inmates who have completed an associate of arts degree, and who meet the guidelines of the Department, may participate in a study release program leading to a bachelors degree. At the men's institutions there is no requirement for an associates degree before applying for study release. KCIW, due to its small population, must impose this requirement to assure sufficient enrollment for continuation of the community college program. (Kassulke Testimony).

(b) Religion

The testimony about religion at KCIW centered around allegations that one of the named plaintiffs, Pat Canterino, was required to "renounce" her Protestant faith in order to attend a Catholic Mass. Ms. Canterino voluntarily resides in the cellblock, and cellblock residents are subject to limits on outside activities, including religious ones, due to security considerations. Ms. Canterino had previously listed her religious affiliation as Baptist. She could not attend both Protestant and Catholic services because of her decision to live in the special management unit. The chaplain, therefore, requested that she change her listed reli-

gious preference to Catholic if she desired to attend Catholic services. The Court finds that this restriction is reasonable, and that a failure to effectively communicate the requirement is at the heart of this disagreement. (Testimony of Pat Canterino and John Lentz).

The only other religious issue in dispute at the time of the trial was the practice of requiring A & O inmates to receive special permission before attending religious services other than Sunday. The A & O Director, Ms. Loving, testified this rule was designed to ensure that new inmates visit all group activities. Since the other organized religious activities do not conflict with other groups, the rule is not necessary, and Ms. Loving admitted that permission was always granted when requested. The logical effect of the rule, then, is its potential chilling effect which could discourage A & O inmates from participating in religious services.

### 7. *Personal Hygiene Supplies*

Women at KCIW are provided with a kit containing all necessary personal hygiene supplies when they enter the institution's A & O Unit. Thereafter, the institution provides only soap, toilet paper and four small trial-size tubes of toothpaste per year unless an inmate is indigent (defined as anyone with less than $5 per month income). All other inmates must purchase personal hygiene items from the prison canteen. (Martinez, Patterson & Griffett Testimony). Male Prisoners at KCIW for service on the maintenance crew are provided with personal supplies free of charge. (Testimony of Mike Bolton).

The state agreed, in the Consent Decree in *Kendrick* and *Thompson*, to provide inmates at KSP and KSR the following items without charge: "adequate and suitable clothing, toothbrushes, toothpaste, razor, razor blades, soap (including hypo-allergenic soap as medically necessary), toilet paper, shaving cream, magic shave and matches." (PX 4, § 21).

### 8. *Handicapped Access*

Shortly after the filing of this suit, KCIW completed construction on its project for removal of physical barriers to handicapped persons. Upon completion of the project, the first floor of the main building, the vocational school, the first floor of the recreation building, and the chapel were accessible. The project cost $83,276.00. Several areas of the institution are still inaccessible to people with physical handicaps. (Testimony of Raleigh Lawrence, Betty Kassulke, Shirley Goins, DX 155, 159). At the time of the trial, no inmates had handicaps which prevented total access to all areas.

### D. CLASSIFICATION

### 1. *Overclassification*

The classification system of the Department of Corrections has undergone substantial revision in the last several years. The current system is now being revised under a grant from the National Institute of Corrections. (Testimony of Steven Kaiser, Director of Classification). There are several areas of the classification system which deserve special comment because of the disparity in its application to similarly-situated men and women inmates.

The classification system is designed to ensure that each prisoner "is assigned to the lowest (i.e., least restrictive) custody level feasible for their individual case." IMD 701.03(J). Nevertheless, only 7.3% (12 of 164) of the women in Kentucky's penal system are classified as community minimum, the custody grade necessary to participate in community programs (*See* PX 1).

The low number of inmates classified as community minimum is attributable, in part, to a sense of maternalism and overprotectiveness which is evident in a number of areas at the institution. This is illustrated by the rule banning communication with male inmates which reflects an exaggerated fear that any social contact would inevitably lead to pregnancy. This belief, apparently shared by many in the administration, has resulted in such overreactions as prohib-

iting men and women from sitting on the same pew during church services (Testimony of Chaplain Lentz) and the effort to force the sole female maintenance worker to take birth control pills. (*See* n. 10, *supra* ). Women at KCIW are viewed as children who cannot be trusted. (Testimony of Seilaff and Goins). This attitude has a definite impact on the classification process at the institution.

As a study done by defendants' own research division puts it:

*In direct contrast to this perceived risk of recidivism and level of sophistication, the caseworkers seemed to feel that females would have more difficulty in adjusting to institutional life and would require closer supervision than males. Eighty-five percent of the females were seen as likely to encounter some difficulty in adjusting to institutional life, whereas only 39% of the males were perceived as likely to encounter adjustment problems (Table 6).*

*According to the caseworkers' recommendations, only 8% of the females should be classified to minimum security, whereas 57% of the males were considered to be minimum security candidates (Table 7). The difference in suggested level of supervision may be explained by policy differences at KCIW and KSR. At KCIW, the women must "earn" minimum security classification through a level system which requires that time be served at the medium security level prior to eligibility for minimum security classification. At KSR, however, men may be directly classified from the A & O Unit to a minimum security facility. The caseworker ratings of females on expected institutional adjustment and level of supervision do not seem to correspond with level of criminal sophistication since there were no significant differences between the sexes on criminal history measures. It is possible, therefore, that caseworker ratings in these areas are not reflective of criminal sophistication, but may be indicative of either traditional views of female offenders or of policy differences between institutions.*

Reese & Riggs, "A Description of Classification and Program Needs of Kentucky Offenders", PX 6, Text accompanying Tables 6 & 7.

The classification system at KCIW, while theoretically separate from the Levels System, still operates on the same philosophy which underlies that system: any restriction is justified until proven otherwise. Thus, while the stated policy of the Department is to classify inmates to the least restrictive custody grade possible, the policy at KCIW is to classify inmates to the least restrictive status only when necessary. (Kassulke Testimony). Instead of encouraging qualified women to apply for community programs, defendants inform women inmates that community minimum status is a necessary *pre-requisite* to application. (Minimum Security Unit Rules, § 20, PX 13). The real policy, however, is to reclassify qualified women to community minimum only *after* application is made. (Kassulke Testimony, Defendants' Post-Trial Brief, at p. 13).

Dr. Fisher testified that, in accordance with the stated policy of the Department, as many inmates as possible should be classified to security designations which allow community integration. Based on his review of the files, he testified that 25–30% of the population at KCIW should be community minimum. Yet the number of inmates, as noted above, in that status equals less than 8% of the population.

### 2. Statutory Restrictions On Minimum Security

The Kentucky General Assembly has enacted a statute listing six categories of offenders who are ineligible to "be worked or released for work outside the walls of the prison." KRS 197.140 (1948 c. 120; KS 3828b–10). The restriction applies to inmates serving a sentence for rape, attempted rape, or who have escaped or attempted to escape within five years, or who have been convicted of armed robbery or armed assault with intent to rob where an injury has been inflicted on any other person. (*Id.*)

Minimum security status is necessary not only for outside *work* programs, but also for outside *study* programs or community programs of any type. In view of the lack of vocational training and educational opportunities at KCIW, this distinction is of crucial importance. The Department has interpreted KRS 197.140, which by its terms is a limitation only for outside work programs, to bar those offenders in the designated categories from minimum security status altogether. Thus, inmates in the six categories listed in KRS 197.140 are barred from all community programs (*See* IMD 605.02) and from living in a minimum security residential unit.

This restriction is rigidly applied, in spite of the more recent action of the Kentucky Legislature establishing a community release program which is designed to benefit any "prisoner as to whom there is reasonable cause to believe will honor his [25] trust," KRS 439.600 (1972 H 205, § 3). Although the only criterion for eligibility listed in the statute is trustworthiness, defendants have applied additional restrictions which the legislature saw fit to apply only to work release programs. IMD 605.02. As a result of defendants' decision to graft the restrictions of KRS 197.140 onto the study and training release programs set up under KRS 439.600, a large number of inmates who would otherwise qualify for community programs are denied access to them.

## II CONCLUSIONS OF LAW

### A. THE LEVELS SYSTEM VIOLATES THE EQUAL PROTECTION AND DUE PROCESS CLAUSES OF THE FOURTEENTH AMENDMENT.

Women in Kentucky's penal system, solely because of their gender, are subjected to a system of behavior modification which, though it was meant to be rehabilitative, has proven to be punitive, harmful, and counterrehabilitative. The indiscriminate imposition of the Levels System on all female prisoners violates both the equal pro-

tection and due process clauses of the fourteenth amendment.

### 1. Equal Protection

■ The equal protection clause requires that "all persons similarly circumstanced shall be treated alike", *F. S. Royster Guano Co. v. Virginia*, 253 U.S. 412, 415, 40 S.Ct. 560, 562, 64 L.Ed. 989 (1920). Substantial privileges which are routinely accorded to all male prisoners in Kentucky are sharply restricted or denied altogether to similarly situated female prisoners due to the KCIW Levels System. This discrimination in the allocation of privileges cannot withstand constitutional scrutiny under the equal protection clause unless it substantially advances an important government interest. *Craig v. Boren*, 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976).

Plaintiffs do not challenge the decision of the state to incarcerate women and men in separate institutions. They merely assert that women are entitled to exercise normal privileges on an equal basis with men. Defendants respond by asserting that "a natural difference exists between the male institutions and the only female institution due to size, security needs and interests of the population, and is not entirely related to the differences in sexes." (Defendants' Post-Trial Brief, p. 5; *see also* pp. 21–22).

■ The record establishes beyond doubt that none of the three asserted justifications for differing treatment applies to the Levels System. Administrators at KCIW expressly testified that the Levels System is *not* a security measure and the expert testimony was unanimous in agreement on this point. The Court finds that testimony conclusive. There is no basis in the record for finding the interests of the population in any way justify the Levels System, and in fact the inmate testimony shows just the opposite. Size is equally irrelevant as a justification for the Levels System. Blackburn, a male institution of comparable size

---

**25.** A rule of statutory construction in Kentucky, K.R.S. 446.020(2), provides that "a word importing the masculine gender only may ex-

tend and be applied to females as well as males."

operates without any of the restrictions on normal privileges which characterize the KCIW Levels System, although there is a much less restrictive variation of a levels system in effect at Blackburn.

█ Defendants now assert that differences between KCIW and the male institutions in allocation of basic privileges are based solely on "resources available at KCIW and the number of people at the institution utilizing those resources." (Defendants' Post-Trial Brief, p. 22). This argument is without merit. There was no evidence to establish more resources were needed to ameliorate the restrictions of the Levels System. To allow the display of pictures, wearing of personal clothes, access to dayrooms, equal visitation rights, and equal bedtimes within the institution would place no greater demand on the resources of the institution. Defendants would have this Court believe these restrictions, among others, are necessary only at KCIW which, by coincidence, happens to be the only institution for women.

█ Even if the institutional resources argument had factual support in the record, it could not serve as a defense for the unequal treatment to which women inmates are subjected in the allocation of basic privileges. It is well established that economic considerations alone cannot serve as an excuse for failure to meet constitutional standards. *Gates v. Collier*, 501 F.2d 1291, 1319–20 (5th Cir. 1974); *Pugh v. Locke*, 406 F.Supp. 318, 330 (M.D.Ala.1976), *aff'd and remanded*, 559 F.2d 283 (5th Cir. 1977); *Holt v. Sarver*, 309 F.Supp. 362, 385 (E.D. Ark.1970). As Judge Feikens observed in a similar situation, "In this context, 'institutional size' is, frankly, not a justification, but an excuse for the kind of treatment afforded women prisoners." *Glover v. Johnson*, 478 F.Supp. 1075, 1078 (E.D.Mich. 1979).

█ In reality, the Levels System has been imposed at KCIW because defendants have implicitly, if not consciously, decided that women are less capable than men of exercising basic privileges. Women are restricted in the exercise of normal privileges—those that could be exercised by all inmates without jeopardizing legitimate correctional needs—while men are not. Thus bedtime, personal appearance, access to visits and phone calls and other routine aspects of daily life are curtailed for women because of an exaggerated fear that administrative inconvenience would result if female inmates were allowed the same modicum of freedom as male inmates in these areas.

These restrictions are imposed solely because of gender with the objective of controlling the lives of women inmates in a way deemed unnecessary for male prisoners. This raises questions in terms of constitutional analysis, for as the Supreme Court recently held, when a state policy is imposed on "members of one gender because they are presumed to suffer from an inherent handicap or to be innately inferior, the objective itself is illegitimate." *Hogan v. Mississippi University for Women*, —— U.S. ——, 102 S.Ct. 3331, 3336, 72 L.Ed.2d 1090 (1982). The Levels System presumes women inmates to be innately inferior to male inmates in the ability to responsibly exercise basic, normal institutional privileges.

These restrictions, based on gender and unrelated to any important government objective, violate fundamental notions of fairness embedded in the constitution and expressed in the equal protection clause of the fourteenth amendment. As the Supreme Court has observed in an analogous context:

> (S)ince sex, like race and national origin, is an immutable characteristic determined solely by accident of birth, the imposition of special disabilities upon members of a particular sex would seem to violate "the basic concept of our system that legal burdens should bear some relationship to individual responsibility." *Weber v. Aetna Casualty & Surety Co.*, 406 U.S. 164, 175, 92 S.Ct. 1400, 1407, 31 L.Ed.2d 768 (1972).

*Frontiero v. Richardson*, 411 U.S. 677, 686, 93 S.Ct. 1764, 1770, 36 L.Ed.2d 583 (1973). (plurality opinion).

■ To the extent that the Levels System imposes restrictions on female inmates in the exercise of privileges routinely allowed to male inmates which could be accorded all prisoners without compromising legitimate correctional needs, the system violates 'the equal protection clause of the fourteenth amendment. These restrictions on the exercise of normal privileges do not serve any important government function and therefore cannot withstand constitutional scrutiny. *Craig, supra,* 429 U.S. at 197, 97 S.Ct. at 456.

■ The Commonwealth of Kentucky, moreover, recognizes that inmates have a right to work for their own rehabilitation. (*See e.g.,* KRS 196.110(2); 196.610; 197.065; 439.590; IMD 606.01; KCIW Resident Staff Handbook § I(B), PX 55). The Levels System conflicts with this state policy of encouraging inmates to seek rehabilitation. (See § I(3) and (4), *supra*). By treating inmates like children, the Levels System frustrates and impedes inmate efforts at rehabilitation, making it difficult for them to learn to function as responsible adults. As Judge Johnson noted in *Pugh v. Locke,* "(W)hile courts have thus far declined to elevate a positive rehabilitation program to the level of a constitutional right, it is clear that a penal system cannot be operated in such a manner that it impedes an inmate's ability to attempt rehabilitation," 406 F.Supp. 318, 330 (M.D.Ala.1976), *aff'd.,* 559 F.2d 283 (5th Cir. 1977), *cert. denied,* 438 U.S. 781, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978). Thus, while the state may not arbitrarily impede any inmate, male or female, in their rehabilitative efforts, it certainly cannot systematically impose a gender-based obstacle to the rehabilitation of women inmates.

### 2. Due Process

■ While the Levels System violates the equal protection clause due to disparities in allocation of individual privileges, it also violates the due .process rights of plaintiffs because of its defects as a system. The system is more than the sum of its individual parts. As a system, this Levels program operates in an arbitrary and punitive manner. It erects obstacles to the efforts of individual inmates to rehabilitate themselves. Participation is required for all women, even those who have committed no act which could warrant this form of punishment.

There are few precedents to guide the Court in its analysis of the Levels System under the due process clause. Two decisions, however, have particular applicability to the situation before the Court. In *Clonce v. Richardson,* 379 F.Supp. 338 (W.D. Mo.1974), a federal district court held the federal prisoners could not be transferred to a mandatory behavior modification system designed for incorrigible inmates and markedly similar to the one before this Court, absent the observation of procedural safeguards for each individual so committed. Similarly, the Supreme Court held in *Vitek v. Jones,* 445 U.S. 480, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980), that a state prisoner could not be transferred to a mandatory behavior modification program in a mental hospital unless procedural safeguards were followed to ensure the transfer was appropriate.

*Vitek* and *Clonce* hold that prisoners are entitled to procedural safeguards before being transferred from a conventional prison to a behavior modification program of the type operated at KCIW. The discrete procedural issue decided in those cases is not before this Court: no transfers are involved and no individual inmates are singled out for participation. The underlying premise of *Vitek* and *Clonce,* however, is that there is a *substantive* right which gives rise to the requirement for procedural safeguards.

■ That substantive right is the right to be free from the unique kinds of deprivations of liberty which are necessary components of this punitive form of behavior modification, unless the state shows that the imposition of such a system is appropriate for a particular individual. Absent such an individualized showing, the imposition of a punitive behavior modification system on an inmate would be punishment that is purely arbitrary and thus violative of due

process. This principle is the underlying foundation of due process of law. As the U. S. Circuit Court of Appeals For the Eighth Circuit explained, in the context of prison disciplinary proceedings:

> ... *Fourteenth Amendment substantive due process requirements are applicable to disciplinary proceedings. Even in those earlier cases in which we held procedural due process inapplicable in comparable settings, we recognized that administrative determinations must not be arbitrary. (Citations omitted.) It would serve little purpose to require fair procedures but to permit arbitrary results. The procedures are not ends in themselves, but are a means to insure that decisions imposing substantial penalties will be based on the knowledge that grounds for the imposition of the penalties exist.*

*McDonnell v. Wolff*, 483 F.2d 1059, 1063 (8th Cir. 1973), *aff'd*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974).

The substantial penalty imposed here is subjection to a punitive and counterrehabilitative form of behavior modification which is "qualitatively different from the punishment characteristically suffered by a person convicted of a crime", *Vitek, supra*, 100 S.Ct. at 1264, and which is so harmful and deeply flawed that not a single expert in the field who testified at trial would defend it.

The state may not deny the right of individual inmates to be free from this arbitrary form of punishment by the procedural technique of imposing it on an entire prison population. In *Clonce*, the Court held that even the most violent and incorrigible federal prisoners could not be placed in such a program until prison officials afforded them basic procedural protections. At KCIW, even the best behaved, model prisoners are subjected to this destructive system.

While "maintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights", of prisoners,

*Bell v. Wolfish*, 441 U.S. 520, 546, 99 S.Ct. 1861, 1878, 60 L.Ed.2d 447 (1979), the evidence shows the Levels System does not advance these goals, and may well impede their achievement. (*See* § I(3), text accompanying n. 6, *supra*). To the extent the system was imposed to address these concerns, it was and is an "exaggerated response" to the valid considerations of order, discipline and security. *See Pell v. Procunier*, 417 U.S. 817, 826–27, 94 S.Ct. 2800, 2806, 41 L.Ed.2d 495 (1974).

The Court must therefore conclude that the Levels System is "a restriction or condition ... not reasonably related to a legitimate goal" and therefore, because it is arbitrary and purposeless, is punishment. *Bell v. Wolfish, supra*, 441 U.S. at 539, 99 S.Ct. at 1874. Such substantial punishment, over and above incarceration, may not be imposed consistent with due process absent a showing it is appropriate for a given individual. As the Supreme Court held in *Jackson v. Indiana*, "At the least, due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed." 406 U.S. 715, 738, 92 S.Ct. 1845, 1858, 32 L.Ed.2d 435 (1972). Persons convicted of crimes deserve to be punished, but this does not give the state license to make prisoners objects of unguided behavior control experiments. The state has failed to carry its burden of showing the Levels System is reasonably related to a legitimate penological goal. The system thus violates due process.

B. DISPARITIES IN OPPORTUNITY FOR VOCATIONAL EDUCATION AND TRAINING AND JOBS VIOLATE FEDERAL STATUTES AND THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT.

1. Non-discrimination Requirements of Federal Grant Programs.

Many of the educational and training programs operated by the Corrections Cabinet receive substantial funding from the feder-

al government. The statutes under which this funding is granted all contain explicit prohibitions against sexual discrimination in the administration of any program which receives the federal money. 20 U.S.C. § 1681(a), 29 U.S.C. § 834(a), and 42 U.S.C. § 3789d(c)(1). The Court, while well aware of defendants' concern over potential problems in complying with these non-discrimination clauses in a correctional setting, cannot ignore the plain language of the statutes. Title IX of the 1972 Education Amendments provides in applicable part:

> No person in the United States shall on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance...

20 U.S.C. § 1681(a).

The Comprehensive Employment and Training Act (CETA) requires that:

> No person in the United States shall on the ground of ... sex ... be excluded from participation in, be denied the benefits of, be subjected to discrimination under, or be denied employment in the administration of or in connection with any program or activity funded in whole or in part with funds made available under this chapter.

29 U.S.C. § 834(a).

The Omnibus Crime Control and Safe Streets Act of 1968, as amended, establishing the Law Enforcement Assistance Agency (LEAA), contains a similar provision:

> No person in any State shall on the ground of ... sex be excluded from participation in, be denied the benefits of, or be subjected to discrimination under or denied employment in connection with any programs or activity funded in whole or in part with funds made available under this chapter.

42 U.S.C. § 3789d(c)(1).

 This Court cannot judicially impose a special exception to these statutes for correctional institutions. Congress was certainly aware that these non-discrimination clauses could result in administrative problems in many areas. As a result, exceptions were made in other areas to the application of the nondiscrimination language of Title IX of the 1972 Education Amendments. See 20 U.S.C. § 1681(a)(1)–(9). If there is a compelling need to exempt corrections from these requirements regarding education and employment programs, that argument should be addressed to the legislative branch. See Hogan, supra, —— U.S. at ——, 102 S.Ct. at 3340, § III(B).

With regard to LEAA funds, congressional intent to include corrections within the purview of the Act, and thus of its non-discrimination clause, is clear. One of the express purposes of the Act is "to support the modernization of state and local court and corrections systems and programs." 42 U.S.C. § 3761(5) (emphasis added).

Accordingly, the Court must apply these provisions in a manner that will effectuate the intent of Congress, considering the statutes' "object and policy." Philbrook v. Glodgett, 421 U.S. 707, 713, 95 S.Ct. 1893, 1898, 44 L.Ed.2d 525 (1975). The Court believes the object and policy of these clauses (to prohibit sexual discrimination in federally-funded programs) can be effected without compromising any valid correctional concerns over security, order, and discipline.

 As discussed below, the equal protection clause requires parity, not identity, of treatment for female prisoners in the area of jobs, vocational education, and training. Glover v. Johnson, supra, 478 F.Supp. at 1079. This standard may be met in a number of different ways, as long as the opportunities available to women are substantially equivalent "in substance, if not in form" to those accorded men. Id. To the extent that opportunities are available to male inmates due to the receipt of federal funds under the cited acts, the state must offer equivalent programs in form as well as in substance, to similarly situated women. This does not require that all such programs must be co-correctional. But it does mean, at a minimum, that a consistent good faith effort must be made to include female inmates in the benefits of all programs funded in part with federal dollars.

2. Equal Protection in Vocational Training and Education and Prison Jobs.

Plaintiffs, as previously noted, do not challenge the policy of incarcerating men and women in separate institutions. They assert, however, that the legitimate policy of housing men and women in separate institutions has been applied in such a manner as to relegate women to an inferior opportunity to take advantage of academic, vocational, and training opportunities.

█ This Court, in considering plaintiffs' equal protection claim in this area, will follow the reasoning of Judge Feikens in *Glover*:

> Where the actual consequence of a seemingly harmless classification reveals such disparate treatment, there is ample justification to treat the classification and its consequence together in order to determine the "fit" between this end result and the legislative purpose.

*Id.* 478 F.Supp. at 1080.

█ The consequence of the gender classification in Kentucky prisons has been inferiority in the areas of vocational education and training, jobs, and pay for women inmates. Women have comprised only a small part of the prison population in Kentucky. This has made it easy to overlook their needs in many areas. But the inferior opportunities available to women inmates are not a necessary consequence of the decision to incarcerate them separately from men. The purpose behind the classification (presumably to ensure security, order, and discipline) is not advanced by the inferior programs offered women.

█ The state must show that the disparate treatment of female inmates is substantially related to an important government objective. *Hogan v. Mississippi University for Women, supra,* —— U.S. at ——, 102 S.Ct. at 3336, *Craig v. Boren, supra,* 429 U.S. at 197, 97 S.Ct. at 456. Defendants assert that the difference in treatment is based on size, needs, interests, and security (Defendants' Post-Trial Brief, p. 11).

█ The argument that the small size of a prison for women can justify inferior treatment was disposed of in *Glover* in a manner which this Court finds persuasive:

> ... a female felon in the State of Michigan will be sent to Huron Valley by reason of her gender alone, and will necessarily have access only to these programs currently available at that location. A male prisoner, on the other hand, can be classified or later transferred to a wide variety of prison facilities in the State and generally will have access to more program opportunities than his female counterpart. I conclude, therefore, that because of these limitations women as a group are treated differently than men as a group, and that these differences in treatment are directly related to gender. The State argues, however, that any differences in treatment are the result of the limitations placed on them by the size of the institution and not on the sex of the inmates housed there. There is, of course, no fixed relationship between size per se and the kinds of programs offered in any given institution. There is, however, an economic relationship which, if not fixed, is at least of great practical significance in determining the range and quality of programs offered. While recognizing that in reality, these considerations alone cannot justify official inaction or legislative unwillingness to operate a prison system in a constitutional manner. (citations omitted).

*Glover, supra,* 478 F.Supp. at 1078.

█ Substitute Kentucky for Michigan and KCIW for Port Huron Valley and this analysis disposes of the institutional size argument before this Court. A desire to preserve the state's limited resources cannot be used to justify an *allocation* of those limited resources which unfairly denies women equal access to programs routinely available to men. *See Plyler v. Doe,* —— U.S. ——, at ——–——, 102 S.Ct. 2382 at 2398–2402, 72 L.Ed.2d 786 (1982), *Gates v. Collier, supra.*

█ The evidence demonstrated that the need of women at KCIW for prison jobs

and vocational training and education was at least as great as the need of men in these areas. Women inmates at KCIW are almost all primary providers for at least one dependent, and most KCIW inmates lack marketable job skills, according to defendants' own research. The needs of the institution, moreover, in many areas of maintenance and operation can be met by giving women inmates parity of access to prison industries, maintenance jobs and training programs that are now available only to men.

■ Defendants advance security as an important interest which could preclude parity of programs, asserting that unless the vocational program at KCIW was substantially improved (which could be expensive), the only way to achieve parity would be to make the vocational programs at nearby KSR or Luther Luckett co-correctional. It is readily apparent that this is the institutional size argument cast in different form. Even if this argument could be accepted, the security concerns of co-correctional programs, on the record before this Court, are not sufficient to justify the denial of parity of programs.

Defendants rely on *Dothard v. Rawlinson*, 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977), to support their security justification theory. In *Dothard*, the Supreme Court upheld a height requirement of the Alabama Corrections Department for prison guard jobs which, though neutral on its face, had a discriminatory impact on women. There the Court observed that:

> The likelihood that inmates would assault a woman because she was a woman would pose a real threat not only to the victim of the assault, but also to the basic control of the penitentiary in protection of its inmates and the other security personnel.

*Id.*, at 336, 97 S.Ct. at 2730.

■ Yet, the record in this case shows that Kentucky's male prisons have employed female guards on a widespread basis without experiencing the problems anticipated by the Supreme Court in *Dothard*. There is no basis in the record for conclud-

ing women inmates in a structured classroom atmosphere, with the low student-teacher ratio available at KSR and Luckett, would pose greater risks than women guards in this respect. In fact, the record shows women inmates have successfully completed a co-correctional paralegal course without incident. Finally, the hiring of more security personnel, even if it proved necessary, would be a financial consideration insufficient to justify the denial of equal protection to female inmates.

■ Defendants assert that female inmates are not sufficiently interested in the vocational programs offered to male inmates to justify the offering of such courses at KCIW. The tests results on which this assertion is based, however, show that female inmates have a relatively high interest in these areas. (*See* DX 105, PX 203). The few non-traditional program opportunities made available in the past have always been filled to capacity. The Court finds, moreover, that the interests of the women inmates have never been assessed in an informed manner which could support the state contention of lack of interest, a factor which does not appear to be considered at male institutions in any event.

■ Defendants are under a constitutional obligation to provide parity of programs and facilities for women. *Glover, supra*, 478 F.Supp. at 1079. They are falling short of that obligation in the areas of prison industries, institutional jobs, vocational education and training, and community release programs.

## C. CONDITIONS OF CONFINEMENT

The Supreme Court has only once considered the limitation that the eighth amendment "imposes upon the conditions in which a State may confine those convicted of crimes." *Rhodes v. Chapman*, 452 U.S. 337, 101 S.Ct. 2392, 2397–98, 69 L.Ed.2d 59 (1981). Neither the Supreme Court nor the United States Court of Appeals for the Sixth Circuit has ever considered a conditions of confinement claim asserted by women inmates claiming gender-based dis-

parities in prison conditions violate the equal protection clause. The Court will therefore attempt to set forth its understanding of the controlling principles of law, then apply those principles to the challenged conditions at KCIW.

The Court held in *Rhodes* that "conditions of confinement that cannot be said to be cruel and unusual under contemporary standards are not unconstitutional. To the extent that such conditions are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society." 101 S.Ct. at 2399. The Court has emphasized that eighth amendment judgments "should neither be nor appear to be merely the subjective views of individual judges." *Rummel v. Estelle*, 445 U.S. 263, 275, 100 S.Ct. 1133, 1139, 63 L.Ed.2d 382 (1980). The Court in *Rhodes* re-affirmed the proposition that "the Eighth Amendment prohibits punishments which, although not physically barbarous, 'involve the unnecessary and wanton infliction of pain.'" *Rhodes, supra,* 101 S.Ct. at 2398, quoting *Gregg v. Georgia,* 428 U.S. 153, 171, 96 S.Ct. 2909, 2924, 49 L.Ed.2d 859 (1976). The Court summarized the obligation of the federal judiciary in conditions of confinement cases in this manner:

> When conditions of confinement amount to cruel and unusual punishment, 'federal courts will discharge their duty to protect constitutional rights.' (citations omitted). In discharging this oversight responsibility, however, courts cannot assume that state legislatures and prison officials are insensitive to the requirements of the Constitution or to the perplexing sociological problems of how best to achieve the goals of the penal function in the criminal justice system: to punish justly, to deter future crime, and to return imprisoned persons to society with an improved change of being useful, law-abiding citizens.

*Rhodes, supra,* 101 S.Ct. at 2401–02.

▮▮▮ Defendants, in oral arguments, urged the Court to reject the equal protection standard adopted by the Court in *Glover v. Johnson, supra,* asserting that the Supreme Court has limited the application of other constitutional protections in a correctional setting. *See e.g., Pell v. Procunier, supra,* (freedom of speech), *Wolff v. McDonnell, supra,* (due process), and *Cruz v. Beto,* 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972) (free exercise of religion.). The rationale for limiting the scope of constitutional protections in a prison setting does not apply to equal protection analysis. Women at KCIW do not seek equal treatment with anyone, male or female, who is free. They seek only to be treated equally with similarly situated male prisoners. The cases in which the Court limited the application of constitutional protections for prisoners all involved situations in which inmates sought to exercise constitutional rights on an equal basis with people not in prison, or in a manner inconsistent with the fact of their confinement. Prisoners are entitled to the full protection of the equal protection clause. *Washington v. Lee,* 263 F.Supp. 327 (M.D.Ala.1966), *aff'd* 390 U.S. 333, 88 S.Ct. 994, 19 L.Ed.2d 1212 (1968). Thus, any gender-based disparities in a prison system must be substantially related to the achievement of an important governmental objective. *Hogan v. Mississippi University for Women, supra; Craig v. Boren, supra.*

▮▮ The eighth amendment sets a minimum standard for conditions of confinement applicable to all persons incarcerated by the state. The fourteenth amendment's equal protection clause requires the state to be evenhanded in the allocation of facilities, benefits, and burdens between male and female inmates in its prison system. This Court, in approving a Consent Decree in *Kendrick* and *Thompson,* has sanctioned the standards of conditions of confinement the state agreed to meet for male inmates at KSP and KSR. The state, to the extent it meets its obligation of evenhandedness under the equal protection clause, therefore, has also fulfilled its obligation under the eighth amendment.

## 1. Population

Overcrowding has become a serious problem at KCIW in recent months. This is the

single most important area of conditions of confinement, because it affects all others. The strain put on the institution by overcrowding has stretched the physical limits of the institution to the point that steps must be taken to correct the problem. Plumbing, waste water disposal, ventilation, lighting and fire safety are all serious problems in the building constructed over forty years ago to house 110 people. The increased work for the staff and increased tension among the population contribute to the scope of the problem.

▮ Kentucky has agreed to meet ACA standards for the housing of male inmates at KSP and KSR. Consent Decree ¶ 2. Those standards are not being met at KCIW at this time. The state has advanced no reason for this disparity which can justify the unequal treatment under the *Craig* test.

The overcrowding problem at KCIW, however, is a new one. It is due to a recent, unanticipated increase in intake, coupled with the abrupt closing of DBCDC. On the one previous occasion when overcrowding became a problem at KCIW, Kentucky officials corrected the problem on their own initiative by opening the Boone County facility for minimum security inmates. Whether the state re-opens a minimum security facility or uses other means to address the problem, equal protection requires that the standards adopted for KSP and KSR be applied to KCIW in the area of population and housing.

▮ The state has, in the past, demonstrated a willingness to take steps to correct this problem and this Court, therefore, will not "assume that ... prison officials are insensitive to the requirements of the Constitution," *Rhodes, supra*, 101 S.Ct. at 2401–02, in the crucial area of overpopulation. Though defendants' own action in closing DBCDC is, in large part, the cause of the current problem at KCIW, that action was taken *prior* to the unanticipated increase in intake. The number of commitments varies from month to month and defendants should be given a limited, but reasonable amount of time to evaluate the recent increase in intake to see if it signals a permanent trend. Only then will they be able to adequately address the long term problem. In the interim, however, steps must be taken to alleviate the immediate and critical problems, such as the lack of space for A&O inmates which has resulted in housing overflow inmates in the infirmary and packing the A&O dorms beyond their capacity.

A wide variety of measures have been used to eliminate unconstitutional overcrowding in prisons. Courts have limited the prison population to design capacity and enjoined the acceptance of new inmates until that goal is reached, *Pugh v. Locke, supra*, 406 F.Supp. at 332; *Williams v. Edwards*, 547 F.2d 1206 (5th Cir. 1977); ordered reclassification of prisoners to reduce population at maximum security institutions, *Palmigiano v. Garrahy*, 443 F.Supp. 956 (D.R.I.1977), *remanded on other grounds*, 599 F.2d 17 (1st Cir. 1978); and imposed specific space requirements, *Gates v. Collier*, 390 F.Supp. 482, 486 (N.D.Miss. 1975), *aff'd*, 525 F.2d 965 (5th Cir. 1977); *Battle v. Anderson*, 447 F.Supp. 516 (E.D. Ik.1977), *aff'd*, 564 F.2d 388 (10th Cir. 1977). This Court will not hesitate to take necessary action to ensure that Constitutional requirements are met in this area if defendants fail to promptly take steps to bring KCIW into compliance with the housing standards in effect for males at KSP and KSR.

2. *Medical and Psychological Care*

▮ Plaintiffs presented a thorough critique of the medical and mental health care available at KCIW. The evidence, however, falls short of demonstrating "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976). Plaintiffs did not allege the denial of medical care to any particular individuals, but rather asserted systemic deficiencies in medical care delivery which could make unnecessary suffering inevitable. The evidence shows that the medical care delivery system could be improved in several ways, particularly in

the area of medical records. The Court is convinced, however, that defendants are meeting the minimum Constitutional obligations in this area.

Defendants agreed in *Kendrick* and *Thompson* to a minimum level of medical and mental health services. The services offered at KCIW in these areas are substantially equivalent to those mandated by the Consent Decree at KSP and KSR. To the extent the number of health care professional hours provided at KCIW are less than at KSP and KSR, the difference is justifiable due to KCIW's smaller population. While the demonstrated emotional and psychological needs of KCIW inmates are a source of concern to the Court, the Court must proceed with caution in addressing claims for services. The mental health needs of the general population present a serious challenge to the prison administrators. They do not, however, reach the level of severity that would justify judicial intervention. *Cf. Newman v. Alabama*, 503 F.2d 1320, 1324 (5th Cir.) *cert. denied*, 421 U.S. 948, 95 S.Ct. 1680, 44 L.Ed.2d 102 (1975).

### 3. *Recreation*

■ The value of recreation, outdoor activities, or the mere chance to walk in fresh air, to one who is confined to a prison is significant in ways difficult for one who is free to understand. As the treating physician at KCIW testified, adequate opportunity for recreation and outdoor activity is an important factor in the mental and physical health needs of inmates at KCIW. Inmates at KSP and KSR are guaranteed significant opportunities for recreation. Consent Decree § 10. The recreational opportunities for KCIW inmates are significantly inferior to those of men, with the main deficiency being restrictions on open yard time. These restrictions, imposed due to lack of staff and exaggerated fear of contact between female inmates and male maintenance workers, are not sufficiently related to an important government goal to withstand equal protection scrutiny. Defendants must offer women inmates opportunities for recreation and outdoor activity substantially equal to those offered men prisoners.

### 4. *Disciplinary and Grievance Procedures*

The Supreme Court has held that certain minimal due process requirements must be followed in prison disciplinary proceedings which could result in the deprivation of a valid liberty interest of an inmate. Prisoners must be given a hearing and provided with written notice of the charges 24 hours in advance of the hearing. She must be given a written statement of the evidence relied upon and the reasons for penalty if disciplinary action is imposed. She must be allowed to call witnesses and present documentary evidence in her defense when confrontation and cross-examination of witnesses would not be unduly hazardous to institutional safety. *Wolff v. McDonnell, supra,* 418 U.S. at 564–66, 94 S.Ct. at 2978–79.

■ The evidence establishes, and defendants in part admit, that these procedures have not been followed in the past at KCIW. While official policy has been recently revised to conform to the *Wolff* standard, there is substantial question as to whether this policy change has been made known to the inmates and whether it is being properly enforced. Inmates at KCIW are entitled to the due process requirements agreed to in the *Kendrick* and *Thompson* Consent Decree § 6 and adopted by the Department in IMD 713.00 *et seq.* There is no substantial reason to afford KCIW inmates less protection in Adjustment Committee procedures. In fact, the evidence shows a demonstrated need for stricter observation of procedural safeguards by the Adjustment Committee at KCIW.

■ The grievance procedure at KCIW is substantially the same as the ones at all male institutions. Inmates at KSP and KSR, however, have the added benefit of a default provision when a grievance is not acted upon within the prescribed time limits. The Court is aware from questions raised in the *Thompson* litigation, that this default provision's practical effect has thus far been perhaps more theoretical than real,

due to time gaps in the procedure (for example, no time limit is prescribed within which a grievance must be referred from the ombudsman to outside review). Nonetheless, it is a protection afforded over 70% of all male inmates that is not available to any woman inmate. There is no substantial reason for this disparate treatment. While the default provision is not available to minimum security men, it should be available to women inmates similarly situated to men at KSP and KSR.

### 5. *Access to Courts*

■ As noted in the findings of fact, defendants have made substantial progress in bringing their law library into compliance with minimum standards. Here again, however, there is still a substantial disparity between the resources available to women inmates and those provided for males under § 8 of the *Kendrick* and *Thompson* Consent Decree. To bring access to courts to Constitutional parity, defendants must 1) supply a library equivalent to those required for males at KSP and KSR, 2) substantially increase the amount of non-program time the library is open, and 3) provide the equivalent of at least one half-time attorney, who will assist inmates in all areas, including habeas corpus and other civil matters, in which they have a demonstrated need. These minimal steps are required by both the equal protection clause and the decision of the Supreme Court in *Bounds v. Smith*, 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977).

### 6. *Education and Religion*

■ Defendants demonstrated the academic program at KCIW provides women with equal opportunity to earn a GED or associate of arts degree, and that the only restriction on the college program is substantially related to the important goal of keeping the community college program in operation. The challenged restriction on participation in religious services for cellblock inmates was demonstrated to be a valid one under *Cruz v. Beto, supra,* 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263. A ruling on the restriction on religious activities of A&O inmates is unnecessary due to the Court's holding on the Levels System.

### 7. *Personal Hygiene Supplies*

■ Defendants must supply women at KCIW with necessary personal hygiene supplies in order to provide parity of treatment with male inmates. Since there is no substantial reason to treat women differently, this conclusion is mandated by the practice of defendants at the male institutions. Consent Decree § 21. *See also* § 254 of the Kentucky Constitution.

### 8. *Handicapped Access*

■ This Court has recognized a private right of action under § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794. *Coleman v. Casey Board of Education,* 510 F.Supp. 301 (W.D.Ky.1980). Defendants have made a substantial effort to provide handicapped access, but because there is no handicapped person presently incarcerated at KCIW, this Court has no adequate means to judge whether the improvements satisfy the requirements of the Act. The Court cannot speculate on such an important question and accordingly must hold that the issue is not ripe for adjudication.

### D. THE CORRECTIONS CABINET'S INTERPRETATION OF K.R.S. 197.-140 IS OVERBROAD AND CONFLICTS WITH K.R.S. 439.600

■ By its own terms, K.R.S. 197.140 applies only to work programs. By their interpretation, defendants have applied K.R.S. 197.140 to work programs *and* study programs. IMD 605.02; IMD 717.04(A). Defendants have persisted in this interpretation in spite of the action of the Kentucky General Assembly in creating the community release study program which contains no similar statutory restriction. K.R.S. 439.-600, the statute creating the study release program lists trustworthiness as the sole criterion for eligibility.

Defendants' interpretation of K.R.S. 197.-140 extends its restrictions to areas beyond those enumerated by the legislature. This

overbroad interpretation violates plaintiffs' right under K.R.S. 439.600 to be considered for considered for study release solely on the basis of trustworthiness.

As a matter of Kentucky law, this Court holds, under its pendent jurisdiction, that the prohibitions embodied in K.R.S. 197.140 may not be applied as a blanket prohibition against community minimum status. Eligibility for minimum security status, and community programs under K.R.S. 439.600, may be limited only by valid correctional concerns related to participation in those programs. To the extent the Department shows any of the statutory restrictions of K.R.S. 197.140 have a reasonable relationship to community minimum status, it may apply those restrictions to that status.

### CONCLUSION

The Court has been guided by a general principle in this case: male and female prisoners must be treated equally unless there is a substantial reason which requires a distinction to be made. In the areas of privileges and opportunities for work, vocational education, training, and community release programs, this standard is not being met in Kentucky. Those issues have been the focus of this lawsuit and as a result, this opinion has necessarily focused on the problems which exist at KCIW.

The Court has not been unmindful, however, of the sincerity of the staff and the effort which has been made to keep KCIW clean and in good repair in spite of the difficulties which come with over-population and age. These factors, while commendable, cannot be a defense to the Constitutional deficiencies which were proved at trial. The Court breaks no new ground in the ruling entered today. Virtually every area has been addressed by other courts and the existing precedent in each area is indistinguishable from the facts demonstrated in the record in this case. The Court feels bound to the rules of law established by the cases cited in the conclusions of law.

The inferiority of programs and discrimination in the area of privileges which were demonstrated at trial are not always the result of conscious sex discrimination. They are often attributable to oversight, omission, and traditional views of female offenders which have not kept pace with the changing inmate population. The discriminatory treatment which has resulted must be remedied. An appropriate order will be entered.